The PEOPLE of the State of Colorado,
Plaintiff–Appellee,

v.

Terrance K. MARIONEAUX,
Defendant–Appellant.

No. 77–1002.

Colorado Court of Appeals,
Div. II.

April 24, 1980.

Rehearing Denied June 12, 1980.

Certiorari Denied Sept. 29, 1980.

J. D. MacFarlane, Atty. Gen., Richard F. Hennessey, Deputy Atty. Gen., Edward G. Donovan, Sol. Gen., Kathleen M. Bowers, Asst. Atty. Gen., Denver, for plaintiff–appellee.

J. Gregory Walta, Colorado State Pub. Defender, Lee Belstock, Sp. Deputy Pub. Defender, Denver, for defendant–appellant.

STERNBERG, Judge.

The defendant, Terrance Keith Marioneaux, appeals his conviction of first degree murder. We perceive his primary contention of error to be that the trial court improperly denied his motion to suppress a confession allegedly obtained in violation of his Fourth and Sixth Amendment rights. He also asserts that the trial court improperly restricted his examination of an expert witness, and that misconduct by the prosecution prejudiced his right to a fair trial. We disagree with these contentions, and therefore affirm.

Marioneaux's conviction stems from the shooting death of Harold Harris. On the night of January 16, 1977, the Adams County Sheriff's Department received a telephone report that shots had been heard in the vicinity of 64th Avenue and Teller Road and that an automobile had been seen leaving the area. When officers arrived at the scene they found Harris severely wounded but still alive. When asked who had shot him, he responded with a name that sounded to the officers like "James Meredith." He then died.

Later that night, investigators from the Adams County Sheriff's Department contacted Harris' parents and his sister, and learned that Harris had planned to meet someone named "Terry" when he had gone out earlier that evening. His sister did not know Terry's last name but directed the officers to a house in Denver which proved to be Marioneaux's residence.

At approximately 7:00 the next morning, five officers of the Adams County Sheriff's Department and the Denver Police Depart-

ment approached the house and, after knocking at the door and identifying themselves, were permitted inside. When they asked for "Terry," Marioneaux was roused from another room and came downstairs dressed only in his undershorts. He was requested to get dressed, and when he went to do so he was accompanied by an investigator. Marioneaux then was taken outside to a police car where two officers questioned him for approximately half an hour. Following this interview, Marioneaux was returned to the house. Three other men who were at the house were also interviewed. Marioneaux and the other men admitted being with Harris on the previous evening but denied any involvement in his death.

After comparing the stories of the four men and the information provided by Harris' relatives, the police officers concluded that inconsistencies as to times of events existed, and requested all four men to accompany them to the police station to make written statements.

At a subsequent suppression hearing Marioneaux testified that he had offered to come to police headquarters later in the day after he had an opportunity to clean up and have breakfast, but that this offer was refused. He also said that he felt he had no choice but to comply with the officers' request. The officers testified that when the men were taken to the Denver police headquarters they were not under arrest, and they were told that they were not under arrest, that they were not suspects, and that they were considered witnesses only. They also asserted that the reason the men were taken to police headquarters was because that location was more conducive to obtaining formal statements than was Marioneaux's home.

Marioneaux and the other three men arrived at the police headquarters at approximately 8:30 A.M. The men were placed in separate interrogation rooms and were advised of their constitutional rights. Each signed a written statement denying involvement in the murder.

Marioneaux provided his first exculpatory statement sometime between 9:00 and 10:00 A.M. Subsequently, he was taken to the police laboratory where a trace metal detection test was performed on his hands in an attempt to determine if he had recently fired a weapon. Marioneaux testified, and the trial court found, that during this time he asked to call his "people"; Marioneaux contends that he also asked to call his father. He was not allowed to do so. He said that he attempted to use the telephone in the interrogation room but was stopped from doing so. He also testified that when he went to the bathroom, one of the police officers accompanied him.

Marioneaux was presented with a form giving consent to the search of his home, and automobile which he signed at 10:55 A.M. (A second consent to search form was signed by Marioneaux at 1:45 P.M., and a search of his home and car followed pursuant to which certain evidence was obtained, including several shotgun shells and some articles of clothing.)

Sometime before 11:00 A.M., the investigators were notified that a wallet belonging to Kenneth Gotier, one of Marioneaux's companions, had been found near the scene of the homicide. Gotier was confronted with this evidence, and at approximately 11:10 A.M., he made an oral statement implicating Marioneaux in the shooting. The statement was reduced to writing and signed by Gotier at noon. Marioneaux was told about this evidence, was again advised of his rights, but continued to deny any involvement in the crime. At 12:08 P.M., he was formally arrested and jailed.

Marioneaux was returned to the interrogation room at 1:00 P.M., and was asked if, in light of Gotier's statement he wanted to change his story. He declined to do so. However, as he was being returned to his cell, he indicated to an officer that he wished to make a new statement. At 1:30 P.M., he signed a written advisement of rights and waiver form and proceeded to make a handwritten incriminating statement. The admission of this statement into evidence against Marioneaux at trial constitutes the principal issue in this appeal.

## I.  *The Arrest*

Marioneaux moved to suppress the statement, but the trial court concluded that he had voluntarily accompanied the officers to the police headquarters, that he was not then a suspect, and was not under arrest. The trial court also found, on supporting evidence, that when Marioneaux was taken to the police headquarters, there existed insufficient probable cause to effect a valid arrest and specifically that probable cause to arrest did not exist until discovery of Gotier's wallet and Gotier's subsequent statement implicating Marioneaux. Marioneaux contends, however, and we agree, that he was under arrest at least as early as when he was taken from his home and transported to the police station.

■ The fact that Marioneaux was not formally arrested when taken to the police headquarters does not preclude a determination that he was in fact legally under arrest. *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). Even if he had voluntarily accompanied the officers to the police headquarters, this voluntary presence could later become an involuntary detention. *See People v. Algien*, 180 Colo. 1, 501 P.2d 468 (1972).

■ The facts as outlined above reveal that when Marioneaux was taken to the police station he was considered more than a mere witness. Suspicion was focusing on him even prior to the time he was removed from his home. Upon arrival at the police station he was advised of his *Miranda* rights, was placed in an interrogation room, was denied permission to contact his "people," was subject to a trace metal detection test on his hands, was denied use of the telephone, and was requested to, and did, sign a consent to search form. All of these factors lead to the conclusion that he was not free to leave policy custody. We conclude, therefore, that Marioneaux was arrested without probable cause in violation of his Fourth Amendment rights. *See Dunaway, supra.*

## II.  *Intervening Circumstances*

■ However, our conclusion that there was a Fourth Amendment violation does not, in and of itself, end our review and require reversal. Rather, Marioneaux's statement may properly have been received in evidence if it was "sufficiently an act of free will to purge the primary taint of the unlawful invasion." *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

■ In *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), the Supreme Court articulated a number of factors to be considered in determining whether a confession is the product of free will, or if it is rather a result of the exploitation of an illegal arrest. These factors include whether *Miranda* warnings were given; the temporal proximity of the arrest and the confession; the presence of intervening circumstances; and, the purpose and flagrancy of the official misconduct. *Brown v. Illinois, supra; People v. Hillyard*, Colo., 589 P.2d 939 (1979); *People v. Henry*, 195 Colo. 309, 578 P.2d 1041 (1978).

■ Here, the discovery of Gotier's wallet and his subsequent statement implicating Marioneaux, had nothing to do with Marioneaux's illegal arrest. At that time there *was* probable cause to arrest Marioneaux and he was formally arrested and again given a *Miranda* warning. The finding of the wallet by the police was, from their viewpoint, a fortuitous event. It constituted an intervening circumstance of such significance that the taint of the illegal arrest did not make Marioneaux's subsequent statement inadmissible.

Marioneaux repeatedly asserted his innocence even when confronted with the incriminating evidence. We deem it of great significance that it was not until approximately two hours after being informed of the discovery of Gotier's wallet and of Gotier's statement that Marioneaux gave the statement at issue. Also, it is significant that the statement was made while Marioneaux was being returned to his cell, after police interrogation had ended.

Furthermore, the record demonstrates that Marioneaux was not unfamiliar with the criminal justice system, having been convicted of two previous felonies. Nor was he an unsophisticated youth; he was 22 and had attended college for two years. *Cf. People v. Bookman*, Colo.App., 615 P.2d 44 (1980).

Based on all of these factors, we view Marioneaux's confession as a product of his free will, and as sufficiently unrelated to the illegal arrest to be properly admitted at trial. *People v. Hillyard, supra; People v. Henry, supra.*

### III. *Demand for Counsel*

■ Contrary to Marioneaux's contention, the denial of his request to telephone his "people" did not constitute a violation of his Sixth Amendment right to representation by counsel. While a request for counsel need not necessarily be in a legally proper form, *People v. Harris*, 191 Colo. 234, 552 P.2d 10 (1976); nevertheless, it must be sufficient to place the interrogating officer on notice that the defendant intends to exercise his constitutional right to counsel. *See People v. Traubert*, Colo., 608 P.2d 342 (1980); *People v. Richards*, 194 Colo. 83, 568 P.2d 1173 (1977).

■ Marioneaux's request here was insufficient to constitute a demand for counsel. In critical contrast to the situation here, the defendant in *Harris, supra*, was an unsophisticated, young, emotionally distraught first–time offender who had asked, "When can I get a lawyer?" While the denial of Marioneaux's request to call his "people" is evidence indicating that he was under arrest, that request, coming as it did from an individual with experience in the criminal justice system, and after his having received *Miranda* warnings, was not tantamount to a request for counsel. *Cf. Mingo v. People*, 171 Colo. 474, 468 P.2d 849 (1970).

### IV. *Proscription of Testimony Regarding the Victim*

■ Marioneaux asserts that the court erred in refusing to allow testimony of a pathologist establishing that the victim was a drug abuser because it was relevant to the defense theory that the deceased had been killed by someone other than Marioneaux in connection with an illicit drug transaction. This testimony was properly excluded because there was no indication that another person had committed an act directly connecting him with the crime. *See People v. Mulligan*, 193 Colo. 509, 568 P.2d 449 (1977). Assuming *arguendo* that this testimony was improperly excluded, similar testimony was before the jury.

### V. *Prosecutorial Misconduct*

Marioneaux's final contention of error relates to alleged prosecutorial misconduct in voir dire, and during closing argument. We conclude that there was no reversible error in either instance.

During voir dire, a potential juror expressed reservations about sending a person to a penal institution for life. The prosecutor, after explaining that the death penalty was not being sought in this case, went further and explained that "when they say life imprisonment, they don't mean life imprisonment." When defense counsel started to object, the court immediately gave a curative instruction. In chambers defense counsel moved for a mistrial. The court denied the motion, choosing to rely on the curative instruction, and indicating that it would reiterate that instruction at the end of the case but defense counsel asked that the instruction not be repeated.

■ The court did not abuse its discretion in denying the motion and relying on the curative instruction. *People v. Anderson*, 184 Colo. 32, 518 P.2d 828 (1974). In our view the prejudice to the defendant by the remarks was not so pervasive that it could not be remedied by means less drastic than a mistrial. *See Maisel v. People*, 166 Colo. 161, 442 P.2d 399 (1968).

Nor is there merit in Marioneaux's contention that the prosecutor's closing argument constituted misconduct that prejudiced his right to a fair trial.

In the written statement, defendant had confessed the crime; however, at trial he testified that he had confessed only to protect the people who were with him. He claimed to have been at his girlfriend's home, together with another man on the night in question. The prosecutor commented on the fact that these two people had not been produced as witnesses to verify the alibi, and also that Marioneaux had lied. It is obvious that Marioneaux lied, either in his written statement, or in his testimony, since both versions could not be true.

Also, during closing argument, defense counsel commented that the prosecution had neither proved nor disproved that someone named "James Meredith," the name mentioned in his last breath by the victim, was the killer. To rebut this assertion, the prosecutor commented that the defense could have "checked this out" itself.

Similar comments to those regarding failure to produce the alibi witnesses were upheld as being proper comments on the evidence in *People v. Medina*, 190 Colo. 225, 545 P.2d 702 (1976). *See also People v. Todd*, 189 Colo. 117, 538 P.2d 433 (1975). Where, as here, defense counsel has raised the issue of the prosecutor's failure to call witnesses to develop a certain theory, the prosecutor may properly point out that the defense also may produce such evidence. *See People v. Pleasant*, 182 Colo. 144, 511 P.2d 488 (1973).

The judgment is affirmed.

RULAND and KIRSHBAUM, JJ., concur.