**The PEOPLE of the State of Colorado, Petitioner,**

v.

**Ben Earl BOOKMAN, Respondent.**

**No. 80SC116.**

Supreme Court of Colorado,
En Banc.

June 21, 1982.

Robert R. Gallagher, Jr., Dist. Atty., James C. Sell, Chief Deputy Dist. Atty., Steven R. Polidori, Deputy Dist. Atty., Littleton, for petitioner.

J. Gregory Walta, State Public Defender, Norman R. Mueller, Shelley Gilman, Deputy

State Public Defenders, Denver, for respondent.

LEE, Justice.

We granted certiorari to review the decision of the court of appeals in *People v. Bookman*, Colo.App., 615 P.2d 44 (1980), which reversed the defendant's conviction by a jury of reckless manslaughter, section 18–3–104(1)(a), C.R.S.1973 (1978 Repl. Vol. 8). We reverse the judgment of the court of appeals and remand with directions.

The defendant, Ben Earl Bookman, Jr., was initially charged with two counts of first degree murder, one count of violent crime, one count of first degree sexual assault, and one count of abuse of a corpse. He entered a guilty plea to the misdemeanor charge of abuse of a corpse, section 18–13–101, C.R.S.1973. After a preliminary hearing, the court found probable cause only as to the lesser included offense of second degree murder. The information was then amended to charge the defendant with two counts of second degree murder, section 18–3–103(1)(a) and (b), C.R.S.1973,[1] and violent crime, section 16–11–309, C.R.S. 1973. After a jury trial the defendant was convicted of reckless manslaughter, section 18–3–104(1)(a), C.R.S.1973 (1978 Repl. Vol. 8).

The events giving rise to the charges were as follows. Shirley Maxine Jones failed to return home from an evening with friends on June 10, 1977. Her body was discovered June 17, 1977 partially buried in a shallow grave by the Cherry Creek Reservoir in Arapahoe County.

Deana Searcy testified that she and the deceased had gone to a dance at the YMCA on June 10, 1977 between 10:30 and 11:00 p. m. where they met the defendant and Kenneth L. Body. Later that evening and through the early morning hours of June 11, the four, along with another young woman, drove around in the defendant's car, visited various bars, and consumed alcoholic beverages. Searcy testified that she was driven to her home at approximately 5:05 a. m. by the defendant, the victim, and Ken Body. Body testified that he was taken home soon thereafter. He confirmed Searcy's account of the previous evening.

On June 19, 1977, after a lengthy interrogation by law enforcement officers, the defendant made incriminating statements, a tape and transcription of which were admitted in evidence over the defendant's objection. The defendant acknowledged he had been with the victim the night of June 10 and early morning of June 11. He stated that after their companions had been dropped off at their homes, he and the victim parked at a lot in east Denver where they engaged in sexual relations. He asserted that the victim had made the sexual overtures to him, but when he could not continue, she commenced kicking and striking him. During the ensuing struggle, he seized her by the neck for approximately thirty seconds to subdue her and she stopped struggling. He then drove to the Cherry Creek Reservoir and left her body resting against a tree. He returned the next morning and buried the body in a shallow grave.

The defendant filed a motion to suppress all statements elicited from him by the police officers on June 19, 1977 and all physical evidence observed or taken by law enforcement officers that day, contending that all were obtained as a result of an illegal arrest.

After a pre-trial suppression hearing, the court refused to suppress the statements, finding that the lengthy questioning of the defendant, which occurred in a patrol car, did not constitute an arrest, that the subsequent search of the defendant's car was a valid search, made with the written consent of the defendant, and that the defendant's first confession was voluntary and provided probable cause for his arrest, after which further statements were obtained from him.

---

1. Section 18–3–103(1)(b), C.R.S.1973, was repealed, L.77, p. 971, section 67, effective July 1, 1977.

The court of appeals reversed, holding that the defendant's Fourth Amendment rights had been violated. It found that the defendant had been illegally arrested at the time he was taken to the patrol car for questioning, since the interview in the car was a detention, without probable cause to arrest. Although a *Miranda* advisement was given at the beginning of the questioning and again later, the appellate court held that such advisement could not remove "the taint of an illegal arrest, nor break the causal connection ... between an unlawful detention and a confession." *People v. Bookman, supra*, 615 P.2d at 46. Accordingly, the court of appeals ordered suppression of the statement and the other evidence seized. *See Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *People v. Bates*, 190 Colo. 291, 546 P.2d 491 (1976).

## I.

The evidence showed that the defendant's statements were made in the following circumstances. On June 19, 1977, at approximately 1:45 p. m., Arapahoe County law enforcement officers, who had previously learned that Bookman had been with the victim, contacted him at a restaurant where he worked and requested that he talk with them about the events of June 10 and 11. The defendant agreed to do so. The restaurant manager offered the use of his office for the questioning. The officers, however, declined and took the defendant to an unmarked patrol car in the parking lot. Other officers arrived at the scene but remained in another car. The officers fully advised the defendant pursuant to the *Miranda* requirements.[2]

The defendant told the officers that he had to meet his family for a pre-arranged Father's Day dinner within a very few minutes.[3] The defendant, however, remained in the patrol car. He sat in the passenger side of the front seat with the doors closed but unlocked, and with the air conditioner running. Detective Klein was at the wheel and Detective Tucker remained in the back seat.

After approximately forty-five minutes of questioning, the officers asked to search the defendant's car which was in the same parking lot. He agreed to the search and signed a written consent form. Detective Tucker left the car to perform the search of the defendant's vehicle, and he was joined by the other officers. Traces of a substance thought to be blood were observed in the defendant's car.[4] Other officers and laboratory technicians, as well as two district attorneys and a tow truck, were summoned to the scene. The car search was conducted from approximately 2:30 p. m. until 5:40 p. m., and the defendant remained in the patrol car under continuous questioning during that period.

At approximately 5:45 p. m., Detective Tucker and Sheriff's Officer Burgess got into the car. Tucker asked the defendant about his psychiatric record and the defendant indicated that he wanted help. Tucker informed him that the police could get psychological help for him.

Officer Burgess then asked the defendant, "Was it an accident?" and the defendant replied "Yes." Tucker obtained a tape recorder from the district attorney and the defendant's statement was taped. Detectives Klein and Tucker then drove around the Denver area with the defendant retracing his path of the early morning hours of June 11 until they reached the Cherry Creek Reservoir and the defendant showed them where he had placed the body. The defendant was taken to the police station at approximately 8:00 p. m. and interrogation continued until he was allowed to see his parents at approximately 11:20 p. m.

---

2. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

3. The defendant's family arrived at the restaurant prior to 2:00 p. m., but were informed that the defendant had been "picked up" by the police, so they returned home and began calling police departments in an attempt to locate their son.

4. Subsequent laboratory tests were inconclusive. The traces were so minimal that technicians were unable to identify the substance as human blood.

The defendant contended that his Fourth Amendment rights had been violated by the prolonged detention by the Arapahoe County law enforcement officers in the custodial setting of their police car. The court of appeals agreed, holding that the defendant had been arrested without probable cause at the time the detectives had "escorted the defendant from the restaurant to the police car," and that the motion to suppress should therefore have been granted.

## II.

The primary issue before this court is whether the trial court applied the appropriate constitutional standard in determining that "the questioning of the defendant in the patrol car did not constitute an arrest," and in concluding that the defendant's Fourth Amendment rights were not unconstitutionally infringed.

In *United States v. Mendenhall*, 446 U.S. 544, 553, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497, 509 (1980), Justice Stewart, in defining the term "seized" in the Fourth Amendment context, stated:

"We adhere to the view that a person is 'seized' only *when, by means of physical force or a show of authority, his freedom of movement is restrained.* Only when such restraint is imposed is there any foundation whatever for invoking constitutional safeguards. *The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but 'to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.' United States v. Martinez-Fuerte,* 428 U.S. 543, 554 [96 S.Ct. 3074, 3081, 49 L.Ed.2d 1116]. As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification.

"Moreover, characterizing every street encounter between a citizen and the police as a 'seizure,' while not enhancing

any interest secured by the Fourth Amendment, would impose wholly unrealistic restrictions upon a wide variety of legitimate law enforcement practices. The Court has on other occasions referred to the acknowledged need for police questioning as a tool in the effective enforcement of the criminal laws. 'Without such investigation, those who were innocent might be falsely accused, and those who were guilty might wholly escape prosecution, and many crimes would go unsolved. In short, the security of all would be diminished. *Haynes v. Washington,* 373 U.S. 503, 515 [83 S.Ct. 1336, 1344, 10 L.Ed.2d 513].' *Schneckloth v. Bustamonte,* 412 U.S. [218] at 225 [93 S.Ct. 2041, at 2046, 36 L.Ed.2d 854]." (Emphasis added.)

Our recent decision in *People v. Pancoast, Jr.,* Colo., 644 P.2d 314 (1982), discussed the objective justification constitutionally required for seizures under the Fourth Amendment, as follows:

"[I]n *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497, 509 (1980), Justice Stewart, in an opinion announcing the judgment of the court, recently stated that the determination of the issue whether a person has been seized for purposes of the Fourth Amendment must be resolved by an objective standard—*that is whether 'in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'* This objective standard is consistent with Colorado case law on the meaning of 'custody' for purposes of the *Miranda* warning. *People v. Algien,* 180 Colo. 1, 501 P.2d 468 (1972); *People v. Marioneaux,* Colo.App., 618 P.2d 678 (1980).

"In this case the district court must determine upon remand whether the defendant was arrested in his home or, instead, voluntarily consented to accompany the officer to the station house to answer questions about a burglary. The court's resolution of the arrest issue must be made *under the 'reasonable person'*

*standard.* In this respect the court must assess the totality of circumstances surrounding the officer's encounter with the defendant. Pertinent factors include the following: the time, place and purpose of the encounter; the words used by the officer, his tone of voice and general demeanor in requesting the defendant to accompany him to the police station; the officer's statements to others who were present during the encounter; the manner in which the defendant was escorted out of the house and transported to the station house; the officer's response to any questions by the defendant or his parents regarding the defendant's right to refuse to go to the station house; and the defendant's verbal or non-verbal responses to any directions given to him by the officer. *See, e.g., United States v. Mendenhall, supra; Gomez v. Turner,* 672 F.2d 134, (D.C.Cir.1982)." (Emphasis added.)

*Mendenhall, supra,* also suggested objective facts that may be considered in determining the existence of the seizure as follows:

"Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. *See Terry v. Ohio, supra,* 392 U.S. [1] at 19, n.16 [88 S.Ct. 1868 at 1878 n.16, 20 L.Ed.2d 889] *Dunaway v. New York,* 442 U.S. 200, 207, and n.6 [99 S.Ct. 2248, 2253 and n. 6, 60 L.Ed.2d 824] 3 *W. LaFave, Search and Seizure* 53–55 (1978). In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person."

446 U.S. at 554, 100 S.Ct. at 1877, 64 L.Ed.2d at 509.

■ In the present case, the trial court did not have the benefit of *Mendenhall,* *supra,* or *People v. Pancoast, Jr., supra.* Since the trial court's findings of fact and conclusions of law at the suppression hearing, although extensive and detailed, do not reveal if the court applied the objective "reasonable person" standard to the facts as found by the court, we believe it essential that the trial court itself make such a determination, rather than an appellate court on a record review of the trial court's proceedings. This we deem to be necessary inasmuch as the trial court's fact-finding function involves a resolution of disputed testimony and the weighing of the evidence in view of the credibility of the witnesses. It follows, therefore, that we must reverse the holding of the court of appeals and direct that the case be remanded to the trial court for findings and conclusions measured by the objective "reasonable person" standard mandated by the United States Supreme Court and by this court in *People v. Pancoast, Jr., supra.* The district court may in its discretion hold a new hearing or make its redetermination guided by the required standard upon the record of the suppression hearing.

### III.

In the court of appeals, the defendant contended other reversible errors occurred in the trial court. We discuss the following which were not considered by the court of appeals.

### A.

The defendant contends that his confession was not voluntarily, intelligently, and knowingly given, in violation of his Fifth Amendment rights, despite the fact that he had received *Miranda* warnings prior to the time his statement was made, and despite the repeated statements he made to the arresting officers that the statement was voluntary, and was made without promises or coercion on the part of the law enforcement officers.

The defendant argues that his confession was made after an offer of psychiatric help, and therefore the police improperly induced him to make incriminating statements. Af-

ter one officer questioned him about his psychological problems, he indicated that he wanted professional help. He thereafter implicated himself in the death of the victim when he was asked whether "it was an accident" and he replied affirmatively.

■ To be admissible in evidence, a confession must be shown to be free and voluntary, made without threats of violence or promises of special consequences, and made without the exertion of improper influences. *Brady v. United States*, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970); *People v. Parada*, 188 Colo. 230, 533 P.2d 1121 (1975); *People v. Pineda*, 182 Colo. 385, 513 P.2d 452 (1973). The voluntariness of the confession must be determined by looking at the totality of the circumstances surrounding the giving of the statement. *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938); *Billings v. People*, 171 Colo. 236, 466 P.2d 474 (1970); *Oaks v. Patterson*, 278 F.Supp. 703 (D.Colo.1968).

■ The defendant was 19 years of age with a ninth grade education. Although he was employed, he was living at home with his parents. He had a history of emotional problems, of which the detectives were aware. He admitted to having several other contacts with the justice system as a juvenile, stating that he had court appearances a few times a year on the average.

The trial court found that the defendant's statement was voluntary and that his testimony regarding the impact of the officer's references to psychiatric help was not persuasive that his confession was coerced. The trial court reviewed the defendant's education and family background, as well as his particular history and experience with legal procedure based on previous contacts with the justice system. The court also considered that the defendant had been instructed by his father and by an attorney that he should not talk to police about the incident without obtaining an attorney. The court determined that the defendant knowingly, intelligently, and voluntarily

waived his right to remain silent and gave the statement because he was "seeking relief from agonizing thoughts of the events related."

On review of the record we find that the evidence is sufficient to support the trial court's determination that the defendant gave his statement voluntarily, and we decline to overturn this ruling.

### B.

The defendant also challenges his conviction of reckless manslaughter under section 18–3–104(1)(a), C.R.S.1973 (1978 Repl. Vol. 8), the prior version of which was declared unconstitutional in *People v. Calvaresi*, 188 Colo. 277, 534 P.2d 316 (1975). He argues that because the *mens rea* definition "recklessly" at the time of *Calvaresi* was found to be indistinguishable from that of "criminal negligence," his conviction under the reckless manslaughter statute cannot be sustained. We do not agree.

■ As a consequence of *Calvaresi, supra,* the General Assembly promptly amended the statute to redefine the terms "recklessly" and "criminal negligence" so that the constitutional infirmity of unequal penalties for the same proscribed conduct no longer exists. The new definitions were in effect at the time that the offense in this case occurred and constituted the *mens rea* elements respectively of reckless manslaughter and criminally negligent homicide. It was not necessary that the entire reckless manslaughter statute be reenacted as a result of the *Calvaresi* decision, but simply that the *mens rea* element be redefined as to each class of offense. Section 2–4–204, C.R.S.1973 (1980 Repl. Vol. 1B). *See People ex rel. Albright v. Trustees*, 103 Colo. 1, 82 P.2d 765 (1938).

The defendant does not contend that the reckless manslaughter statute is unconstitutional as amended.[5] We find no merit to the defendant's contention that his conviction must be overturned on the basis of the

---

**5.** For an interpretation of the amended definitional language, *see, People v. Bettis*, 43 Colo.

App. 104, 602 P.2d 877 (1979).

previous flawed language, which was not in effect when he was convicted.

### C.

The defendant finally asserts that the trial court erred in refusing to submit to the jury his tendered jury instruction No. 1. The tendered instruction provided as follows:

"It is a theory of this case that Ben Earl Bookman, Jr., accidentally stimulated the carotid sinus cavity, also known as the vagal nerve plexus, thus causing a reflex cardiac arrest which resulted in [the victim's] death.

"If you find the prosecution has not disproved this theory beyond a reasonable doubt, you shall find the Defendant not guilty. If you find this theory has been disproven and that the elements of one of the charges has been proven beyond a reasonable doubt, you should find the Defendant guilty of that charge."

The defendant argues that he was entitled to this theory of the case instruction because there was support for it in the evidence. *See, e.g., People v. Meller*, 185 Colo. 389, 524 P.2d 1366 (1974); *People v. Moya*, 182 Colo. 290, 512 P.2d 1155 (1973). The coroner, who testified as to the cause of death, indicated that he could not rule out carotid sinus stimulation as a possible cause of death.

The trial court, however, refused the tendered instruction because the evidence indicated that the death of the victim was not accidental but rather admittedly was the result of the defendant placing his hands on the victim's throat. The court gave instructions on lesser included offenses of manslaughter and criminal negligence, which do not require specific intent, but refused to instruct on accidental death. The court did, however, give the defendant an opportunity to amend his tendered instruction to correct the failure of the instruction to distinguish between the counts which involved an intentional crime and the lesser included offenses which did not require specific intent. The defendant declined to amend the instruction.

We agree with the ruling of the court requiring that the defendant amend the tendered instruction. The term "accidentally" was vague and could have mislead the jury into believing that it must acquit the defendant of all charges if it found that he did not have the intent to kill the victim. Thus "accidentally" would have eliminated from the jury's consideration the *mens rea* elements for lesser included offenses such as that of reckless manslaughter, which does not require either a general intent or a specific intent, but only that a person "consciously [disregard] a substantial and unjustifiable risk that a result will occur or that a circumstance exists." Section 18-1-501(8), C.R.S.1973 (1978 Repl. Vol. 8).

Since the defendant declined to amend the instruction to correct its deficiencies as properly requested by the trial judge, it was not reversible error to refuse to give the tendered instruction.

The judgment is reversed and the case is returned to the court of appeals with directions to remand to the district court for further proceedings in accordance with the views herein.