The PEOPLE of the State of Colorado,
Plaintiff-Appellant,

v.

John P. LEWIS, Defendant-Appellee.

No. 82SA565.

Supreme Court of Colorado,
En Banc.

Feb. 28, 1983.

Alexander M. Hunter, Dist. Atty., Ann B. Stone, Deputy Dist. Atty., Boulder, for plaintiff-appellant.

Miller, Gray, Hale & Truman, P.C., William R. Gray, Boulder, for defendant-appellee.

QUINN, Justice.

The People in this interlocutory appeal challenge a suppression ruling of the district court. The court, after entertaining the defendant's motion to reconsider a prior denial of his motion to suppress by another district judge, suppressed approximately one-half pound of cocaine seized by police officers from the defendant's automobile during a temporary detention of the defendant for suspected drug trafficking. The court determined that the officers' initial actions in contacting the defendant led him to reasonably believe that he was not free to leave the scene, and on this basis the court concluded that the defendant had been arrested. Since the officers had only reasonable suspicion to detain the defendant rather than probable cause to arrest him, the court suppressed the cocaine as the fruit of an illegal arrest. We conclude that the court erroneously applied a probable

cause standard to a temporary detention, and we accordingly reverse the suppression order.

## I.

On May 30, 1978, an information was filed in the district court charging the defendant with the sale of a narcotic drug, cocaine, on April 28, 1978, in Boulder County, Colorado. Section 12–22–302 and 322, C.R.S.1973 (1978 Repl.Vol. 5). The defendant filed a motion to suppress, which was heard on November 9, 1978, and denied.

The evidence at the suppression hearing established that the defendant's arrest was the product of an intensive investigation, conducted by the Colorado Organized Crime Strike Force and local law enforcement agencies, of illegal drug traffic in the Boulder area in the early part of 1978. In April of that year Officers Petrafeso and Simmons, working in an undercover capacity, made contact with a Mr. Madigan, who was a reputed local cocaine dealer. The agents arranged to meet Madigan on April 28, 1978, at the Boulder El Rancho Hansen Motel for the purpose of purchasing a pound of cocaine for $28,800.

It had been agreed that the purchase would be made in two stages, one-half pound at a time. Madigan also agreed that if, after testing, the buyers found the first half pound to be of acceptable quality and purchased that amount, he would then contact his supplier somewhere near the motel and return with the other one-half pound for testing and possible purchase. The officers had prearranged to tell Madigan that the first half pound was of poor quality and to ask him to make contact with his supplier for a higher quality drug. With various other officers conducting a surveillance of the motel and surrounding area, it was hoped that by this ruse Madigan would lead the officers to his supplier.

Madigan, accompanied by a friend, Chifullo, met the officers at room 12 of the motel and was prepared to transact the sale. After Agent Petrafeso tested the cocaine and told him that it was of poor quality, Madigan made a telephone call

from the motel room to "John," his supplier. Petrafeso asked Madigan to let him talk to John. John told Petrafeso that although he knew the cocaine was of high quality, he nevertheless agreed to furnish Madigan with another batch.

Madigan left the motel to meet with his supplier. Petrafeso also left on the pretense that he was going to check on his money in his car across the street. Petrafeso observed Madigan walk to a Kentucky Fried Chicken restaurant where he talked with another man at the front of the restaurant. Both men then went to the rear of the restaurant and Petrafeso momentarily lost sight of them. Petrafeso at this time radioed the surveillance officers that someone should "get near the Kentucky Fried Chicken" because Madigan was meeting with his supplier at the restaurant. After the radio message was transmitted, Madigan came into view again and returned to the motel with a fresh supply of cocaine.

Two of the surveillance officers, Cantwell and House, heard Petrafeso's radio transmission and drove immediately to the parking lot of the restaurant. They arrived there after Madigan had already returned to the motel. Since the officers had no description of the supplier, they employed a process of elimination in determining which person, of those present, might be the likely suspect. There were three vehicles in the parking lot. One was in the process of leaving, and since the drug transaction was still being negotiated in the motel, the officers eliminated the driver of that vehicle. Two persons were present in another vehicle, casually eating chicken, and they eliminated those as likely suspects.

The other vehicle in the parking lot was occupied by the defendant. Cantwell observed the defendant sitting in his vehicle, not eating, and looking intently into his side view mirror which was focused on the El Rancho Hansen Motel. During the next ten minutes the defendant never took his eyes off the mirror and appeared to be extremely nervous. While Cantwell and House had the defendant under observation, Petrafeso transmitted another radio message in which he stated that the purchase had been completed and Madigan and Chifullo had been arrested inside the motel. Petrafeso also told the surveillance officers that Chifullo had a weapon on his person and that they should be cautious in contacting the suspected supplier because he might be armed.

Upon receiving this transmission Officers Cantwell and House approached the defendant's vehicle in order to detain him until Petrafeso arrived and either identified or cleared him as the man whom Madigan had previously contacted at the restaurant. In approaching the vehicle Officer House had his gun drawn, and Officer Cantwell ordered the defendant to keep his hands on the steering wheel. Cantwell opened the defendant's car door and told the defendant to stay there while he searched "around his legs and under the seat for a gun." The defendant was then ordered out of the vehicle. While House frisked the defendant for a weapon, Cantwell looked inside the vehicle around the dashboard area for a weapon. At this point Cantwell observed several plastic baggies of white powder protruding from a black bag located on the floor of the front seat. The suspected cocaine was seized and the defendant was arrested. Officer Petrafeso arrived moments later and identified the defendant as the man whom he previously had observed meeting with Madigan at the restaurant.

The court, in denying the motion to suppress, ruled that Officers Cantwell and House had reasonable suspicion to detain the defendant for a temporary investigation and to frisk him for weapons. The court also concluded that the cocaine was observed in plain view during this temporary detention and was properly seized as contraband.

The case was scheduled for trial on June 26, 1979, but the defendant failed to appear. He was ultimately apprehended in June 1982 in Nederland, Colorado. During this intervening period the judge who denied the original motion to suppress had retired from the bench and the case was assigned to another judge. In the latter part of 1982

the defendant filed a motion to reconsider the suppression ruling, alleging that there had been a substantial change in Colorado law since the order denying suppression. The court agreed to reconsider the defendant's motion and ruled that it would consider the transcript of the prior hearing and any evidence pertinent to the legal standards applicable to the motion.[1] No new evidence was presented by either the prosecution or the defense. On November 16, 1982, the court suppressed the cocaine, ruling that the officers' conduct in initially contacting the defendant led him to reasonably believe that he was not free to leave the parking lot and, therefore, he had been subjected to an arrest rather than a detention. Since at the time of the arrest the officers only had a reasonable suspicion of criminal activity rather than probable cause, the court concluded that they "were unlawfully in the car of the Defendant" when the cocaine was seized.[2]

The People on this appeal urge two grounds for reversal. They argue that since the initial order denying the defendant's motion to suppress was supported by substantial evidence, it was improper for another district judge to reconsider the suppression motion. They also argue that the district judge, in granting the defendant's motion, applied an inappropriate constitutional standard in suppressing the evidence seized from the defendant's vehicle. We will consider these arguments separately.

## II.

We reject the People's first argument that a district judge may not reconsider a motion to suppress previously denied by another district judge. A motion to suppress is interlocutory in character, and neither *res judicata* nor collateral estoppel applies to a ruling which is less than a final judgment. See, e.g., *DiBella v. United States,* 369 U.S. 121, 82 S.Ct. 654, 7 L.Ed.2d 614 (1962); *People v. Hearty,* 644 P.2d 302 (Colo.1982); *D.H. v. People,* 192 Colo. 542, 561 P.2d 5 (1977); *Gonzales v. District Court,* 164 Colo. 433, 435 P.2d 384 (1967). The judge presiding over the trial of a case

1. As the defendant's motion to reconsider is not part of the record before us, we are not advised of the changes in law upon which the defendant relied in requesting a reconsideration. In the order of suppression, however, the court referred to the following changes in the law since the denial of the original motion: the law of standing as relating to the defendant's right to challenge the seizure of telephone and other records pertaining to room 12 of the El Rancho Hansen Motel; and the objective standard of arrest.

2. The court refused to suppress the seizure of the records pertaining to room 12 of the motel and that ruling is not before us at this time. With respect to the cocaine seized from the defendant's vehicle, the court ruled in pertinent part as follows:

"It is clear to the Court that at the time Agent Cantwell and Agent House approached the Defendant, the Defendant was under arrest. Facts leading to this conclusion are that Agent House had his weapon drawn and trained on the Defendant, the officers searched the Defendant in his automobile in connection with that contact, and testimony of both agents establishes that the Defendant was not free to go at that point.

"The test to be applied to determine if the contact is a detention or an arrest is set out in various cases. That test is whether a reasonable person would have believed that he was not free to leave. See *People v. Bookman,* ... 646 P.2d 924 (Colo.1982); *People v. Pancoast,* ... 644 P.2d 314 (Colo. 1982). These cases also set out pertinent factors to consider when deciding if a reasonable person would feel free to leave. Having considered those factors in light of the evidence presented in this case the Court finds that a reasonable person in the Defendant's situation would not feel free to leave. The Officers' conduct evidences an arrest as opposed to a detention.

"The next issue is whether there was probable cause to effect that arrest without a warrant. This Court finds that there was no such probable cause. At the time of the arrest, the information known to the agents at best, rose to a reasonable suspicion to detain the Defendant. The agents themselves state that they were unclear whether the Defendant was the one they were suppose[d] to have under surveillance, but that he was acting suspiciously enough to be a good contact—i.e. to find out what he was doing there.

"Since there was no probable cause for the arrest, the officers were unlawfully in the car of the Defendant. They do not meet the test set out for a warrantless search based on the plain view doctrine."

is necessarily responsible for the admission of evidence during the trial and any judgment that might ultimately be entered in the case. We recognized this responsibility of the trial judge in *Gibbons v. People*, 167 Colo. 83, 445 P.2d 408 (1968), where we held that a pretrial denial of a motion to suppress by one judge does not necessarily bind another judge to whom the case had been assigned for trial where, in the period intervening between the pretrial motion and the scheduled trial, there had been a significant change in constitutional principles applicable to the suppression issue. It would make little sense to hold that if a judge responsible for any final judgment in the case perceived that a palpable error had been committed in the resolution of a pretrial motion, he nonetheless could take no measures to correct it. *See Sunshine v. Robinson*, 168 Colo. 409, 451 P.2d 757 (1969). The judge to whom the case is assigned for trial should therefore be accorded the discretion to entertain a motion to reconsider a previously denied motion to suppress when the motion to reconsider is predicated on a representation that substantial changes in law render the prosecution's evidence inadmissible at trial. *See Gouled v. United States*, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647 (1921); *Rouse v. United States*, 359 F.2d 1014 (D.C.Cir. 1966). Under the circumstances present here the district court had the authority to reconsider the defendant's motion to suppress.

### III.

We turn to the People's principal contention that the court applied an inappropriate constitutional standard in suppressing the evidence seized from the defendant's vehicle. The court, citing our recent decisions in *People v. Pancoast*, 644 P.2d 314 (Colo. 1982) and *People v. Bookman*, 646 P.2d 924 (Colo.1982), reasoned that because the officers' initial contact with the defendant caused him to reasonably believe that he was not free to leave the parking lot, he thereby had been subjected not to a temporary detention but to an arrest, requiring for its justification probable cause to believe that he committed a crime. Since probable cause to arrest was lacking, the court concluded that the officers had no right to enter the car and to seize the cocaine. We believe the court misconstrued the scope of our decisions in *Pancoast* and *Bookman*.

In *Pancoast*, the defendant confessed to a burglary during a stationhouse interrogation, and the critical factual question at the suppression hearing was the timing of the defendant's arrest—that is, whether the defendant had been arrested at his home or, instead, had agreed to accompany the officer to the stationhouse for questioning and only thereafter was arrested. The district court, in suppressing the evidence, determined the arrest issue on the basis of the police officer's testimony that he would have chased the defendant if he had run. We reversed and remanded for a redetermination of the arrest issue on the basis of the objective standard of seizure set forth in *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980): whether, in view of all the circumstances surrounding the incident, a reasonable person in the position of the defendant would have believed that he was not free to leave. Likewise, in *People v. Bookman, supra,* the central issue was whether the defendant's confession was the product of an illegal arrest or a consensual and noncustodial interview. Bookman was approached by police officers at a restaurant where he worked and agreed to speak to them. He was then escorted to an unmarked police vehicle in the restaurant parking lot where he was questioned for several hours and ultimately confessed to the killing of a young woman. We reversed his conviction and remanded for a determination whether his confession was the product of an illegal arrest as measured by the objective or reasonable person standard of *Mendenhall.*

We did not hold nor intend to imply in either *Pancoast* or *Bookman* that all forms of police intrusion which lead a person to reasonably believe that he is not free to leave constitute, on that basis alone, an arrest which must be supported by probable cause. Our express reference to "arrest" in

these cases was because it was this form of intrusion, and none other, which was at issue. The scope and length of the intrusion was such that, if nonconsensual, it could only be characterized as an arrest and nothing else. *See Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). Indeed, *Pancoast* and *Bookman* make clear that we adopted *Mendenhall's* objective or reasonable person standard to all forms of police intrusions constituting a "seizure" of the person, including temporary detentions.[3]

■■■ The district court erred in concluding that the defendant's reasonable belief that he was not free to leave the scene rendered the officers' actions in detaining him an arrest which must be supported by probable cause. To be sure, when a police officer accosts an individual and restrains his freedom to walk away, he has "seized" that person in a constitutional sense. It does not follow, however, that the seizure necessarily amounts to an arrest which must be supported by probable cause. Limited intrusions into personal security, such as an investigatory stop or a limited search or frisk of the person, may be employed under narrowly defined circumstances upon less than probable cause. *E.g., Michigan v. Summers,* 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981); *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *People v. Johnson,* 199 Colo. 68, 605 P.2d 46 (1980); *People v. Martineau,* 185 Colo. 194, 523 P.2d 126 (1974); *People v. Lucero,* 182 Colo. 39, 511 P.2d 468 (1973); *Stone v. People,* 174 Colo. 504, 485 P.2d 495 (1971). As we recently stated in *People v. Tate,* 657 P.2d 955, 958 (Colo.1983):

> "Three conditions . . . must exist before a person may be subjected to some form of intermediate intrusion, such as an investigatory stop or a limited search of his person: (1) there must be an articulable and specific basis in fact for suspecting that criminal activity has or is about to take place; (2) the purpose of the intrusion must be reasonable; and (3) the scope and character of the intrusion must be reasonably related to its purpose."

The police officers' actions in this case, when measured by the appropriate constitu-

---

3. Our statement in *Pancoast,* later reaffirmed in *Bookman,* was as follows:

"Admittedly, when a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person in a constitutional sense. *Terry v. Ohio,* 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889, 903 (1968). It does not follow, however, that every personal confrontation between a police officer and a citizen, which results in some form of interrogation directed to the citizen, necessarily involves a 'seizure' of the person. *Cf. Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (defendant's compliance with officer's request that he come to police station to discuss something, and ensuing station house interrogation, during which defendant confessed to burglary, not a 'custodial interrogation' so as to require *Miranda* advisement prior to questioning). 'Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may [a court] conclude that "a seizure" has occurred.' *Terry v. Ohio, supra* [392 U.S.] at 19 n. 16, 88 S.Ct. at 1879 n. 16, 20 L.Ed.2d at 905 n. 16. In *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497, 509 (1980), Jus-

tice Stewart, in an opinion announcing the judgment of the Court, recently stated that the determination of the issue whether a person has been seized for purposes of the Fourth Amendment must be resolved by an objective standard—that is whether 'in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' This objective standard is consistent with Colorado case law on the meaning of 'custody' for purposes of the *Miranda* warning. *People v. Algien,* 180 Colo. 1, 501 P.2d 468 (1972); *People v. Marioneaux* [44 Colo.App. 213] 618 P.2d 678 (1980)."

Our opinion in *Pancoast,* announced on May 3, 1982, was modified on June 18, 1982, but the modification was not reported in the opinion published at 644 P.2d 314. The modification pointed out that *Mendenhall* was an opinion announcing the judgment of the court and that the objective standard of seizure was consistent with our interpretation of "custody" for purposes of the *Miranda* warning. The quotation set out above is from the official opinion on file with this court. *Pancoast* as modified was recently republished at 659 P.2d 1348 (1982).

tional standard, pass muster as a legitimate form of intermediate police response to the situation confronting them at that time.

■ Officers Cantwell and House had an articulable and specific basis in fact for suspecting that the defendant was engaged in criminal activity. Officer Petrafeso had previously broadcast to these officers his observations of the meeting between Madigan and Madigan's drug supplier which took place outside the Kentucky Fried Chicken restaurant. Moments after hearing the broadcast, Officers Cantwell and House proceeded to the restaurant parking lot where they observed three vehicles occupied by various parties. Out of this group the defendant was the only one who apparently was there for reasons other than eating. The officers over the next ten minutes saw the defendant nervously and intently focusing his attention on the nearby motel where the drug sale between Madigan and Petrafeso was about to take place. Once the officers were notified by Petrafeso that the drug sale had taken place, they were justified in stopping and detaining the defendant for further investigation.

The purpose of the detention was reasonable—that is, to determine whether Officer Petrafeso could identify the defendant as Madigan's source of supply for the cocaine. Petrafeso's viewing of the defendant could be arranged in a matter of minutes. If he identified the defendant as Madigan's connection, the officers would have probable cause to arrest. If Petrafeso was unable to make an identification, there is nothing to indicate that the defendant would not have been immediately released.

■ Last, the scope and character of the intrusion were reasonably related to its purpose. Because Petrafeso had cautioned the officers that Madigan's supplier might be armed, it was not inappropriate for Officer House to draw his weapon in approaching the defendant in the interest of self-protection. Nor, in view of Petrafeso's warning, was it unreasonable for the officers to frisk the defendant for a weapon and to examine the area around the driver's seat of the vehicle. With the defendant standing directly outside the vehicle, the presence of a weapon inside would have posed an immediate threat to the safety of the officers. Where, as here, police officers have reasonable suspicion to stop and temporarily detain the driver of an automobile and are cautioned beforehand that he might be armed, a contemporaneous, cursory examination for a weapon in the area of the driver's seat is reasonably related in scope and character to ensuring the officers' safety during the period of detention. *See, e.g., United States v. Wilkerson,* 598 F.2d 621 (D.C.Cir.1978) (where officer had reasonable suspicion that driver or passenger of temporarily detained automobile was armed, he was authorized to pat jacket lying on car seat in search for weapons); *United States v. Stevens,* 509 F.2d 683 (8th Cir.1975), *cert. denied,* 421 U.S. 989, 95 S.Ct. 1993, 44 L.Ed.2d 479 (1975) (when lawfully conducting a limited "stop and frisk," officers entitled to require occupants to withdraw from vehicle and, upon finding a shotgun shell on passenger's person, to search underneath car seat); *Hill v. State,* 275 Ark. 71, 628 S.W.2d 284 (1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 180, 74 L.Ed.2d 147 (1982) (where officers had reasonable suspicion that occupant of car was armed and dangerous, they were entitled to search accessible areas of the car); *State v. Smith,* 56 Ohio St.2d 405, 384 N.E.2d 280 (1978) (where a police officer stopped and approached a motor vehicle at night and saw the driver, while leaving the car, furtively conceal something under the front seat, a limited search of that area was reasonable for the purpose of the officer's protection); *Griffin v. State,* 604 S.W.2d 40 (Tenn.1980) (where officers reasonably suspected defendant of robbery, it was proper to stop the car in which he was a passenger, frisk his person, and search underneath the seat where he had been sitting).

■ Because the cocaine was observed during the course of a legitimate intrusion that was justified at its inception, and because of the obviously incriminating character of the evidence, it was properly seized under the plain view doctrine. *E.g., Cool-*

*idge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *People v. Franklin,* 640 P.2d 226 (Colo.1982).

The suppression ruling is reversed.

ROVIRA and NEIGHBORS, JJ., do not participate.