**UNITED STATES of America**

v.

**Anthony J. CURCIO, a/k/a "Anthony Rizzo" and Carmen J. D'Amato, a/k/a "Butchie".**

**Cr. Nos. 88–196–1, 88–196–2.**

United States District Court, E.D. Pennsylvania.

Dec. 30, 1988.

---

Robert E. Courtney, III, Philadelphia Strike Force, Philadelphia, Pa., for plaintiff.

James C. Schwartzman, Philadelphia, Pa., for defendant D'Amato.

Louis Savino, Philadelphia, Pa., for defendant Curcio.

## MEMORANDUM AND ORDER

DITTER, District Judge.

Defendant Carmen D'Amato moves to suppress physical evidence seized during a warrantless search of a hidden room on the second floor of a Philadelphia warehouse. For the reasons set forth below, his motion is denied.

### FACTS

Most of the facts relevant to this motion are undisputed. In February of 1984, D'Amato entered into a lease for property on Richmond Street, Philadelphia, with David Mermelstein, a partner and co-owner of the Active Realty Company ("Active Realty"), which was an agent for the Active Realty Company Profit Sharing Trust ("Active Trust"), the record owner of the property. The lease was to run from March 1 through June 30, 1984. The lease contemplated a sale of the property from Active Trust to D'Amato. Paragraph 2 of an addendum states:

> This is a month to month lease to end in four months—in the event they [the leasor and leasee] complete settlement beforehand lease will terminate, otherwise it will continue month to month. Thirty days notice will be given by either party prior to ending occupancy.

The parties orally agreed that if any other tenants could be found to occupy parts of the property, the rental payments from these tenants would be set off against D'Amato's rent.

By October of 1984, the sale of the Richmond Street property had not taken place, although the parties continued to abide by the other terms of the lease. On October 3, 1984, D'Amato's co-defendant, Anthony Curcio, gave Mermelstein a deposit to be credited towards the purchase of the property. Two days later, a sales agreement

was drafted, though not signed, between Active Trust and Uptight Siding Company, a business owned by D'Amato and members of his family.

The sale of the Richmond Street property never took place. In early 1985, Hummel Engineering Company began to rent and exclusively to occupy the first floor of 3320 Richmond Street. In March of 1985, Mermelstein refunded all money deposited towards the sale of the property. By May of 1985, the parties agreed that the sale had "fallen through" and that D'Amato no longer intended to buy the property. D'Amato gave a set of keys to the second floor of the property to Mermelstein and retained a set for himself. D'Amato understood that Mermelstein would be showing the second floor to prospective tenants. Mermelstein told D'Amato that he could continue to store boxes of equipment on the first floor until Mermelstein found new tenants for the second floor. As of November 12, 1986, no new tenants had been found.

On November 7, 1986, pursuant to information from an informant regarding the alleged unlawful production of methamphetamine on the second floor of 3320 Richmond Street, Drug Enforcement Administration Agent Fred Butler sought the consent of Active Realty to search the property. That day, Iris Freidfeild, the office manager of Active Realty, signed a consent to search form authorizing DEA agents to search the property at 3318–3322 Richmond Street. On November 12, 1986, before the search took place, Agent Butler also obtained Mermelstein's verbal consent to search the property.

The search was conducted the afternoon of November 12. During the course of the search, the DEA agents noticed that there were some personal effects belonging to D'Amato on the first floor, but they did not search or seize these items. The second floor appeared to have been vacated. Although the space had been divided into small offices, none seemed to be in use. While searching the second floor, Agent Butler discovered a "hidden room" behind a temporary wall that had been built adja-

cent to the bathroom. By removing a panel, the agents were able to enter the hidden room. Like the rest of the second floor, this room appeared to be unoccupied. With the exception of a water heater, piping, a sink, a ceiling fan, and some shelving, the room contained no fixtures and very few personal items. Before the DEA agents executed a full search of the hidden room, but after the room was discovered and observed, Agent Butler obtained the written consent of Mermelstein, who had since arrived at the property, to search the entire second floor of 3320 Richmond Street.

The DEA agents collected scrapings and residue from the walls, ceiling fan, sink, and insulation of the hidden room, as well as pieces of insulation material, rug padding, fiberglass panels, and bottle stoppers discovered in plain view. Upon laboratory analysis, some of these materials tested positive to the presence of methamphetamine. These materials are now the subject of D'Amato's motion to suppress.

DISCUSSION

I. *Standing*

In *Rakas v. Illinois*, 439 U.S. 128, 134, 99 S.Ct. 421, 425, 58 L.Ed.2d 387 (1978), the Supreme Court held that suppression may only be sought by those whose Fourth Amendment rights have been violated. The proponent of the motion to suppress has the burden of establishing that his Fourth Amendment rights were violated, *id.* at 130 n. 1, 99 S.Ct. at 424 n. 1; the court then determines whether the movant has a "legitimate expectation of privacy in the invaded place." *Id.* at 143, 99 S.Ct. at 430. If the area searched was not within the movant's zone of privacy, his constitutional rights were not violated, and he has no standing to challenge the search. *Id.* at 133–34, 99 S.Ct. at 424–25.

In this case, D'Amato avers that the government cannot properly rely on the third-party consents to search obtained from Freidfeild and Mermelstein in light of his superior property interest as leasee of the second floor of 3320 Richmond Street. To support his claim, D'Amato points to paragraph 24 of the February, 1984, lease

with Mermelstein[1] and to paragraph 2 of the addendum, *see supra* p. 238, both of which provide for a continuation of the lease on a month to month basis, absent written notice of termination by one of the parties. He alleges that neither he nor Mermelstein had ever executed a written notice of termination. He further alleges that he had done repair work and had made improvements for his benefit and for the benefit of Hummel Engineering. When the sale fell through, D'Amato claims that he "negotiated with Hummel," Tr. at 83, in order to remain on the premises for an indefinite period of time in exchange for the value of improvements made. Although this alleged agreement was never reduced to writing, he asserts that Mermelstein orally consented to this arrangement, thereby rendering D'Amato a leasee with a reasonable expectation of privacy in the second floor at the time of the search.

Although the law of property does not control the validity of a third-party consent or the existence of a legitimate expectation of privacy, *see Rakas*, 439 U.S. at 143, 99 S.Ct. at 430; *United States v. Matlock*, 415 U.S. 164, 171 n. 7, 94 S.Ct. 988, 993 n. 7, 39 L.Ed.2d 242 (1974), it is often useful in certain limited circumstances where it has been invoked as the only ground for standing. *See United States v. Sledge*, 650 F.2d 1075, 1081–82 (9th Cir.1981). Paragraph 24 is a standard Form 50 lease provision that exists for the protection of the landlord so that tenants who continue to occupy property beyond the lease's expiration date remain liable for rent. Paragraph 2 of the addendum parallels the rent guarantee afforded the lessor in paragraph 24 of the lease.

D'Amato's attempt to invoke these lessor-protection provisions to create a month-to-month tenancy in the second floor of 3320 Richmond Street must fail. D'Amato's lease for the entire premises expired two and a half years before the search took place. He had ceased paying rent and had completely abandoned the second floor at least a year and a half before the search. D'Amato did not become a tenant in sufferance simply by virtue of the fact that neither he nor an agent for Active Trust bothered to sign a written notice of termination. Mermelstein's willingness to allow D'Amato to store goods on the first floor hardly created an implied tenancy with respect to the second floor; likewise, without an express agreement between D'Amato and Active Trust,[2] improvements made to the property by D'Amato for his benefit and for the benefit of Hummel did not constitute "rent."

D'Amato has presented no evidence that could lead a reasonable person to conclude that on November 12, 1986, he had any right to possession, custody, or control of the premises; hence, D'Amato had no legitimate expectation of privacy in the area searched. *See United States v. Baron–Mantilla*, 743 F.2d 868, 870 (11th Cir.1984); *see also Abel v. United States*, 362 U.S. 217, 241, 80 S.Ct. 683, 698, 4 L.Ed.2d 668 (1960) (search of defendant's hotel room after he had checked out and paid bill did not violate Fourth Amendment); *Sledge*, 650 F.2d at 1978–79 (defendant loses legitimate expectation of privacy in abandoned rental property). *Compare Stoner v. California*, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed. 2d 856 (1964) (third-party consent invalid

---

**1.** Paragraph 24 states in pertinent part:
[E]ither party hereto may determine this lease at the end of said term by giving to the other party written notice thereof at least thirty days *prior thereto*, but in default of such notice, this lease shall continue upon the same terms and conditions in force immediately prior to the expiration of the term hereof … from month to month.

**2.** Hummel Engineering was merely a tenant of Active Trust in March of 1985, and not an agent authorized to negotiate lease agreements with other tenants. Therefore, even if I were to accept as true D'Amato's testimony that he "negoti-

ated with Hummel," Tr. at 83, for permission to remain on the property in consideration for repairs already made to the building, this agreement would not bind Active Trust. Furthermore, *it is far from clear whether Hummel* intended for D'Amato to remain on the premises as a tenant, or whether its permission merely extended to D'Amato's boxes on the first floor. In any event, I find Mermelstein's testimony that the repair work was voluntary and not in consideration for an extended tenancy, Tr. at 58–59, to be credible and consistent with the other facts.

where police knew defendant still occupying hotel room). Without a legitimate expectation of privacy, D'Amato lacks standing to challenge the constitutionality of the search. *See Baron–Mantilla*, 743 F.2d at 870.

## II. *Third–Party Consent*

■ Even if I were to assume, arguendo, that D'Amato had a legitimate expectation of privacy in the second floor of 3320 Richmond Street, I would nonetheless conclude that under the totality of the circumstances, *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973), the third-party consent at issue here was valid.[3]

In *United States v. Gradowski*, 502 F.2d 563, 564 (2d Cir.1974), the Second Circuit articulated a concise test based on the Supreme Court's decision in *Matlock*, 415 U.S. at 171, 94 S.Ct. at 993, to determine the validity of third party consents to search: "Consent to search by one with access to the area searched, and either common authority over it, a substantial interest in it or permission to exercise that access, express or implied, alone validates the search." In this case, the consents to search challenged by D'Amato satisfy not one, but all, of the *Gradowski* criteria.

D'Amato testified at the suppression hearing that he gave Active Realty keys to the second floor, Tr. at 82, as well as verbal permission to show the space to prospective tenants and to enter for "emergency purposes," Tr. at 79. Thus, as agents of Active Realty, Freidfeild and Mermelstien not only had physical access to the second floor of 3320 Richmond Street, but also had D'Amato's express permission to enter.[4] D'Amato stated that Active Realty was "acting as an agent for myself...." Tr. at 85. In *United States v. Baswell*, 792 F.2d 755 (8th Cir.1986), the Eighth Circuit affirmed the district court's denial of a motion to suppress evidence seized pursuant to a warrantless, third-party consent search where the district court had found an implied agency relationship between the home-owner and his caretaker, the consenting third party. The court held that this agency relationship, which gave the caretaker the right to enter the home and to "look out for the property," also gave him the " 'implied authority' ... to authorize the entry of investigating officers if he thought someone was doing something unlawful." *Id.* at 759.

Although in *Baswell*, the evidence was not being offered against the homeowner, who had created the agency relationship, but against another individual with a legitimate expectation of privacy in the home, D'Amato's case nonetheless provides an analogous, if not more concrete, situation. D'Amato intended for Active Realty to act as his "agent." He also intended for Active Realty to take care of the premises in an emergency. D'Amato cannot now claim that Freidfeild and Mermelstein, as representatives of his "agent," Active Realty, did not have the " 'implied authority' ... to authorize the entry of investigating officers if [they] thought someone was doing something unlawful." *Id.*[5] Surely the

---

**3.** *Schneckloth v. Bustamonte* mandates that as an initial matter, " '[w]hen a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given.' " 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973) (quoting *Bumper v. North Carolina* 391 U.S. 543, 548, 88 S.Ct. 1788, 1791, 20 L.Ed.2d 797 (1968)). D'Amato has not challenged the voluntariness of the consents given by either Freidfeild or Mermelstein.

**4.** Active Realty's "substantial interest" in the second floor of 3320 Richmond Street derives from its status as a lessor actively engaged in the search for a tenant, and as an agent for Active Trust, the record owner of the property. This

element of the *Gradowski* criteria requires no further discussion.

**5.** D'Amato makes much of the fact that Active Trust, and not Active Realty, is the record owner of the Richmond Street property. D'Amato argues that if I were to find that a consent search per se did not violate his Fourth Amendment rights, I would nonetheless have to conclude that the consents by the agents of Active Realty, as opposed to the trustees of Active Trust, were invalid since Active Realty had no ownership interest in the premises. D'Amato's assessment of the law regarding third-party consents is incorrect. In a third-party consent case, the relevant issue is whether the consenting party has the defendant's authority, either ex-

possibility of criminal activity, past or present, would constitute an "emergency" in the minds of Freidfeild and Mermelstein.[6]

At a minimum, Active Realty had "common authority" over the area searched, *Gradowski*, 502 F.2d at 564, rendering valid any consent to search executed by an agent of Active Realty, even absent D'Amato's express permission. Common authority exists where there is

> mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*Matlock*, 415 U.S. at 171 n. 7, 94 S.Ct. at 993 n. 7. Courts have applied the *Matlock* definition to cases involving uses of property other than residential. *E.g., United States v. Rizk*, 842 F.2d 111 (5th Cir.) (consent search of briefcase), *cert. denied,* —— U.S. ——, 109 S.Ct. 90, 102 L.Ed.2d 66 (1988); *United States v. Cook*, 530 F.2d 145, 148 (7th Cir.) (consent search of poultry house), *cert. denied,* 426 U.S. 909, 96

S.Ct. 2234, 48 L.Ed.2d 835 (1976). The Ninth Circuit has held that common authority need not exist in fact, so long as the police " 'in good faith relie[d] on what reasonably, if mistakenly, appear[ed] to be ... authority to consent to the search.' " *United States v. Hamilton*, 792 F.2d 837, 842 (9th Cir.1986) (quoting *Sledge*, 650 F.2d at 1081).[7]

D'Amato testified that as of December of 1985, his pest control business, which he had formerly operated out of the second floor, was inactive. Tr. at 86. He did not claim to have any other use for the property after that time. Agent Butler testified that he made an effort to determine who owned the Richmond Street property and whether there were any current leasees of the second floor before pursuing consents to search. Tr. at 31–34. Based on all the testimony, I find that Agent Butler acted with care before deducing that no one occupied the second floor in November of 1986, and that it was reasonable for him to rely on the facts as presented by Freidfeild and Mermelstein in concluding that Active Realty, as record owner of the property, at the very least had "joint access or control for most purposes." *Hamilton*, 792 F.2d at 842.

---

6. The Ninth Circuit has attached "special significance" to the fact that a suppression movant entrusted a key to the premises to the consenting third party. *United States v. Gulma*, 563 F.2d 386, 389 (9th Cir.1977) (third party's consent to search hotel room did not violate Fourth Amendment where defendant gave him key with no intention to return); *United States v. Murphy*, 506 F.2d 529, 530 (9th Cir.1974) (employee with key to employer's warehouse for purposes of performing work on premises can consent to search), *cert. denied,* 420 U.S. 996, 95 S.Ct. 1433, 43 L.Ed.2d 676 (1975); *see also United States v. Dubrofsky*, 581 F.2d 208, 212 (9th Cir.1978) (third party with key and access to property can give valid consent). Without more, a key to the premises will not validate a

press or implied, to admit others onto the premises. The property interest of the consenting party with respect to the area searched is irrelevant. Furthermore, there is no requirement that the consenting party have a legitimate expectation of privacy in the property. Nevertheless, for the record, I find that any consent to search by representatives of Active Realty, agent for Active Trust, legally binds Active Trust.

third party's consent to search. In D'Amato's case, however, when considered along with other evidence of access, Mermelstein's key to the second floor destroys D'Amato's expectation of privacy.

7. The "good faith defense" recognizes that the exclusionary rule is not advanced by excluding otherwise probative evidence seized pursuant to an officer's reasonable, albeit incorrect, belief that a third party has the power to consent. Courts have denied suppression where an officer acted in good faith in ascertaining whether a third party possessed the necessary authority to consent. *See Sledge*, 650 F.2d at 1080–81 & nn. 4, 5. Therefore, even if I were to have found in Part I that D'Amato had not *actually* abandoned the second floor, he *could not* successfully challenge the search since Agent Butler relied in good faith on Mermelstein and Freidfeild's recitation of the facts, the leasehold records, the voided sales agreement, and his own observations. *See id.* at 1079. Likewise, in Part II, absent express permission by D'Amato for Active Realty to exercise its access to the property, the DEA agents reasonably concluded that Active Realty had D'Amato's implicit authority to admit outsiders to the second floor.

Although Mermelstein testified that he entered the second floor less than three times after January of 1985, Tr. at 59, the absence of *actual* use does not preclude a finding of common authority. In *Cook*, 530 F.2d 145, the court explained that "the determining factor in the [common authority] decision was that of assumption of the risk." *Id.* at 149 (term "mutual use" is "given content" by term "assumed the risk"). The assumption of the risk doctrine, first introduced in *Frazier v. Cupp*, 394 U.S. 731, 740, 89 S.Ct. 1420, 1425, 22 L.Ed.2d 684 (1969) (by sharing duffle bag with cousin, defendant "assumed the risk that [cousin] would allow someone else to look inside"), and later relied on in *Matlock*, 415 U.S. at 170–71, 94 S.Ct. at 992–93, has predominated in Fourth Amendment cases. *Cook*, 530 F.2d at 146. By providing Active Realty with keys to the second floor and by condoning the inspection of the area by potential leasees of Active Realty, D'Amato assumed the risk that Active Realty might allow DEA personnel to inspect the second floor as well. *See United States v. Piet*, 498 F.2d 178, 181 (7th Cir.) (defendant assumed risk that consenter would permit search when he gave consenter possession of keys to warehouse), *cert. denied sub nom., Markham v. United States*, 419 U.S. 1069, 95 S.Ct. 655, 42 L.Ed.2d 664 (1974). In light of the foregoing, any alleged privacy interest in the Richmond Street property that D'Amato might assert would be nonexclusive; therefore, at a minimum, Active Realty had common authority to consent to a search.

### III. *Enclosed Spaces*

■ D'Amato alluded to the existence of an independent privacy interest in the "hidden room" discovered when Agent Butler moved a wall panel. Indeed, prior decisions have recognized that an otherwise valid third-party consent does not necessarily cover every object or enclosed space. *See, e.g., United States v. Block*, 590 F.2d 535, 541 (4th Cir.1978) (although mother could consent to search of house, she could not consent to search of son's footlocker found in his room); *United States v. Padrone*, 657 F.Supp. 840, 847 (D.Del.1987)

(authority to consent to search of car does not extend to another's luggage found within car), *aff'd without op. sub. nom., United States v. Rubio*, 857 F.2d 1466 (3d Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 512, 102 L.Ed.2d 547 (1988); *United States v. Gilley*, 608 F.Supp. 1065, 1068 (S.D.Ga. 1985) (guests in house have separate privacy interest in own luggage which cannot be waived by host's consent to search general premises). In this case, however, any attempt to invoke a separate privacy interest in the hidden room is misplaced. The hidden room is unlike a piece of luggage or a footlocker. It does not constitute personal effects found within the general area searched, nor does it resemble a closed compartment, such as a wall safe, which retains its integrity even if removed from the premises itself. Instead, the hidden room is merely an artificially segregated portion of the second floor which loses its distinction when an access panel is removed from the wall.

In *Frazier v. Cupp*, 394 U.S. 731, 740, 89 S.Ct. 1420, 1425, 22 L.Ed.2d 684 (1969), the Supreme Court refused to "engage in such metaphysical subtlties" where the defendant alleged that although he had given the consenting third party permission to share his duffle bag, that permission did not extend to the compartment of the duffle bag in which the police found incriminating evidence. More recently, in *United States v. Morales*, 861 F.2d 396 (3d Cir.1988), the Third Circuit, distinguishing *Block*, rejected defendant's assertion of an independent privacy interest in a hollowed-out compartment behind the rear seat of his car. The court held that a third party's valid consent to search the general interior of the car extends to "an immediately apparent, readily accessible compartment." At 401. Applying *Frazier* and *Morales* to the facts before me, I find that Freidfeild and Mermelstein's consents to search the entire Richmond Street property, and Mermelstein's specific consent to search the second floor, automatically incorporated the hidden room.

Even assuming that D'Amato's expectation of privacy survived *Frazier* and *Mo-*

*rales,* and he were able to establish a special privacy interest in the hidden room, on the basis of the *Gradowski* test, I would still deny his motion. Agents of Active Realty clearly had the means to access the hidden room by way of a key to the second floor and by the removal of a temporary wall panel. They also had D'Amato's implied permission to exercise this access. D'Amato agreed that prospective tenants could examine the premises. It is certainly foreseeable that a reasonable person would want to inspect the property thoroughly before signing a lease. It is also foreseeable that in the course of such an inspection, that person would decide to examine the water heater, as well as the piping to which it is connected, both of which were contained in the hidden room. Furthermore, it would be reasonable for a potential tenant to measure the dimensions of the second floor and to discover that a portion of the advertised space was "missing." By allowing agents of Active Realty to admit prospective tenants to the second floor, D'Amato not only assumed the risk that those agents would admit DEA personnel to the area, *Frazier,* 394 U.S. at 740, 89 S.Ct. at 1425, but he also assumed the risk that *any* observers might discover and inspect the hidden room.

CONCLUSION

D'Amato had no legitimate expectation of privacy in the second floor of 3320 Richmond Street on the day the search took place. Alternatively, any privacy interest he may have retained was properly waived by Active Realty's third-party consent.