The PEOPLE of the State of Colorado,
Plaintiff–Appellant,

v.

Stephen C. BREIDENBACH and
Denise Diana Breidenbach,
Defendants–Appellees.

No. 93SA309.

Supreme Court of Colorado,
En Banc.

June 13, 1994.

Chris D. Hefty, Dist. Atty., Thirteenth Judicial Dist., Fort Morgan, for plaintiff-appellant.

Robert W. Cook, Arlad W. Shunneson, Boulder, for defendants-appellees.

Justice MULLARKEY delivered the Opinion of the Court.

The district attorney brings this interlocutory appeal pursuant to C.A.R. 4.1 and section 16–12–102(2), 8A C.R.S. (1986 & 1993 Supp.), to challenge an order of the Logan County District Court suppressing evidence and statements made by defendant Stephen C. Breidenbach (Steve Jr.). For the reasons set forth below, we affirm the suppression order in part, reverse in part, and remand the case to the district court for further proceedings consistent with this opinion.

I

The Logan County Sheriff's Office received information from a crime stopper's report that marihuana was being grown by Doug Breidenbach on agricultural land located in Logan County. In an effort to corroborate this information, on September 25, 1992, Undersheriff Robert Bollish requested that a helicopter perform an aerial search of property owned by members of the Breidenbach family. During one of the helicopter flyovers, marihuana was spotted in a field owned by Breidenbach Brothers, Inc. (Breidenbach Brothers),[1] and a search warrant was obtained for this property.[2]

While en route to the field, Bollish stopped Steve Jr.'s father, Stephen J. Breidenbach (Steve Sr.), on a farmstead compound five to eight miles away from the area where the search warrant was executed. The compound consisted of three to five acres, and contained barns, corrals, two homes and miscellaneous outbuildings. The compound was owned by Steve Sr., but Steve Jr. and David lived there in separate houses as compensation for doing farm work for their father.

---

1. According to the record, the defendant's brother, David Breidenbach (David), was the president of Breidenbach Brothers. However, Steve Jr. was not a member of Breidenbach Brothers, and had no ownership interest in any of the farm land searched in this case.

2. Three marihuana plants were discovered in the Breidenbach Brothers' field when the warrant was executed, but they were not the subject of the motions to suppress at issue in this case.

After Bollish told Steve Sr. that marihuana had been found on the Breidenbach Brothers' property, Steve Sr. signed a written consent form authorizing officers to search all property owned or leased by him. Later, David also signed a written consent authorizing the search of all Breidenbach Brothers' property.

Soon thereafter, David and Steve Sr. accompanied three law enforcement officials on a tour of the buildings on the compound. During a search of one of the buildings, Deputy Page observed a man running into a wooded area several yards away. Page drew his weapon and pursued the man, later identified as Steve Jr., who was crouched down behind a tree. Without reholstering his weapon, Page asked Steve Jr. who he was, and what he was doing there. According to the district court, Steve Jr. answered that he was "checking irrigation water in a nearby ditch." Page then said "I think you are lying to me. I think you are destroying marihuana plants." Steve Jr. responded by telling Page that there were four marihuana plants growing in the area. Page then took Steve Jr. by the arm, and asked him to lead Page to the plants. They walked a few feet into the wooded area and Steve Jr. showed Page two of the plants. At that time, Page holstered his weapon and told Steve Jr. that he was under arrest. Steve Jr. then was handcuffed and escorted to a police car parked in the compound.

Before placing him into the car, Page asked Steve Jr. if he would consent to a search of his home, and Steve Jr. refused. He also asked his wife, defendant Denise Diana Breidenbach, not to allow the police to search their home. Steve Jr. then left in the custody of Page, destined for the Logan County Jail in Sterling, Colorado.

On the way, Page indicated on the police radio that he had a subject in custody and was transporting him to Sterling. Bollish heard this radio transmission and instructed Page to stop and await his arrival at a site

approximately one-half mile from the arrest location. Upon his arrival at the meeting point, Bollish again asked Steve Jr. to consent to the search of his home. Initially, Steve Jr. refused, but he later consented when Bollish told him "[w]e are going to get a warrant anyway." Once Bollish obtained Steve Jr.'s consent, he returned to the property to search the defendants' residence. Denise Breidenbach was arrested after officers found marihuana and several firearms in the home.

When Steve Jr. was being booked into the Logan County Jail, Page advised him of his *Miranda*[3] rights for the first time, and he signed the advisement form indicating that he understood his rights. Page then asked Steve Jr. to provide a written statement, which Steve Jr. agreed to do after being told that things would be easier for him if he did so. This statement was obtained approximately one hour and five minutes after Steve Jr.'s arrest.[4]

On October 5, 1992, Steve Jr. and Denise Breidenbach were charged with cultivation of marihuana[5] and possession of eight ounces or more of marihuana.[6] They later filed motions to suppress all evidence and statements, and these motions were granted by the district court on October 28, 1993. In its order, the district court concluded that the statements initially made by Steve Jr. were obtained in violation of the Fourth Amendment because the prosecutor failed to establish that David and Steve Sr. had the authority to consent to a warrantless search of the area where Steve Jr. was found. Alternatively, the district court found that the statements were elicited by Page during a custodial interrogation without benefit of a prior *Miranda* warning. The district court further determined that Steve Jr.'s actions in showing Page the location of the marihuana plants, his consent to the search of his home, and his written statement at the jail were either involuntary statements or products of

---

3. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

4. After having been readvised of his *Miranda* rights approximately three hours later, Steve Jr. made another statement to officers at the jail.

However, the contents of that statement were never offered at the hearing.

5. § 18–18–406(8), 8B C.R.S. (1992 Supp.).

6. § 18–18–406(4)(b), 8B C.R.S. (1992 Supp.).

the illegal interrogation. Accordingly, the district court suppressed all of the statements and evidence obtained by law enforcement officials in this case.

## II

### *Steve Jr.'s Statements*

■ Under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), statements made by a defendant during a custodial police interrogation are inadmissible as evidence in a criminal case unless the prosecutor establishes that the defendant was advised of certain constitutional rights and waived those rights. Thus, two requirements must be met before *Miranda* is applicable: the person making the statement must be in "custody," and the statement must be the product of police interrogation. *People v. Haurey*, 859 P.2d 889, 893 (Colo. 1993); *People v. Sharpless*, 807 P.2d 590, 591 (Colo.1991); *People v. Horn*, 790 P.2d 816, 817 (Colo.1990).

■ The prosecution contends that the district court erred in concluding that Steve Jr. was in custody during his initial encounter with Deputy Page in the woods. According to the prosecution, this encounter was simply an "investigatory stop,"[7] as opposed to an arrest. In our view, this argument is based on a misunderstanding of the definition of custody and its application to the facts in this case.

■ We have frequently stated that the term "custody" encompasses more than formal arrest situations. *People v. LaFrankie*, 858 P.2d 702, 705 (Colo.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1663, 128 L.Ed.2d 379 (1994); *People v. Thomas*, 839

P.2d 1174, 1179 (Colo.1992); *People v. Hamilton*, 831 P.2d 1326, 1330 (Colo.1992). The only relevant inquiry is whether a reasonable person in the suspect's position would consider himself deprived of his freedom of action in a significant way at the time of questioning. *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 3151–52, 82 L.Ed.2d 317 (1984); *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 713–14, 50 L.Ed.2d 714 (1977); *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612; *Haurey*, 859 P.2d at 893; *LaFrankie*, 858 P.2d at 705. The determination of whether an individual was in custody at the time of questioning is a question of fact to be resolved by the trial court after assessing the credibility of witnesses and weighing their testimony. *LaFrankie*, 858 P.2d at 706; *Hamilton*, 831 P.2d at 1331; *People v. Trujillo*, 784 P.2d 788, 792 (Colo.1990). These findings will not be reversed on appeal if supported by competent evidence and if the correct legal standard was applied. *Haurey*, 859 P.2d at 893; *People v. Probasco*, 795 P.2d 1330, 1332 (Colo.), *cert. denied*, 498 U.S. 999, 111 S.Ct. 558, 112 L.Ed.2d 564 (1990); *Horn*, 790 P.2d at 818.

■ Although an investigatory stop is a "seizure" within the meaning of the Fourth Amendment, *Thomas*, 839 P.2d at 1177, this does not necessarily mean that the suspect is "in custody" for purposes of *Miranda*. See *Berkemer*, 468 U.S. at 440, 104 S.Ct. at 3150; *United States v. Streifel*, 781 F.2d 953, 958 (1st Cir.1986); *People v. Archuleta*, 719 P.2d 1091, 1093 (Colo.1986). This is because an investigatory stop usually involves no more than a very brief detention without the aid of weapons, and an atmosphere which is less threatening than that surrounding the kinds

---

7. An investigatory stop is proper under the Fourth Amendment when (1) the officer conducting the stop has an articulable and specific basis in fact for suspecting that criminal activity has occurred, is taking place, or is about to take place; (2) the purpose of the detention is reasonable; and (3) the scope and character of the intrusion are reasonably related to its purpose. *People v. Weston*, 869 P.2d 1293, 1296 (Colo. 1994); *People v. Tate*, 657 P.2d 955, 958 (Colo. 1983).

Under the third prong of this test, officers may use an amount of force which is reasonably related in scope and character to ensuring their safety

during the period of detention, *People v. Weeams*, 665 P.2d 619, 622 (Colo.1983); *People v. Lewis*, 659 P.2d 676, 682 (Colo.1983), and may even effectuate the stop with guns drawn if it is reasonable under the circumstances. *United States v. Merritt*, 695 F.2d 1263, 1273 (10th Cir.1982) ("[T]he use of guns in connection with a stop is permissible where the police reasonably believe [the weapons] are necessary for their protection."), *cert. denied*, 461 U.S. 916, 103 S.Ct. 1898, 77 L.Ed.2d 286 (1983); *Lewis*, 659 P.2d at 682; *People v. Cooper*, 731 P.2d 781, 783 (Colo. App.1986).

of interrogation at issue in *Miranda.* *Berkemer,* 468 U.S. at 440, 104 S.Ct. at 3150; *United States v. Perdue,* 8 F.3d 1455, 1464 (10th Cir.1993).

■ This is not to say, however, that *Miranda* rights can never be implicated during a valid investigatory stop. Rather, a court must examine the facts and circumstances surrounding the encounter in order to determine whether *Miranda* applies. *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (per curiam); *People v. Wallace,* 724 P.2d 670, 673 (Colo.1986). Thus, *Miranda* rights can be implicated when police detain a suspect using a degree of force more traditionally associated with concepts of "custody" and "arrest" than with a brief investigatory detention. *Berkemer,* 468 U.S. at 440, 104 S.Ct. at 3150; *see also Perdue,* 8 F.3d at 1466 (*Miranda* warnings required when officers forced suspect's car to stop with their guns and then questioned the suspect with weapons drawn); *United States v. Smith,* 3 F.3d 1088, 1098 (7th Cir.1993) (*Miranda* warnings necessary during an investigatory stop which became "custodial" due to use of handcuffs), *cert. denied,* —— U.S. ——, 114 S.Ct. 733, 126 L.Ed.2d 696 (1994); *People v. Maiden,* 210 Ill.App.3d 390, 155 Ill.Dec. 120, 124, 569 N.E.2d 120, 124 (Ill.App.1991) (defendant should have been advised of *Miranda* rights prior to questioning when officers entered premises with guns drawn); *People v. Taylor,* 178 Cal.App.3d 217, 223 Cal.Rptr. 638, 645 (1986) (defendant "in custody" for purposes of *Miranda* when questioned at gunpoint); Richard A. Williamson, *The Virtues (and Limits) of Shared Values: The Fourth Amendment and Miranda's Concept of Custody,* 1993 U.Ill.L.Rev. 379, 409 (1993) (arguing *Miranda* warnings should be required prior to questioning a suspect during highly intrusive investigatory stops).

■ In this case, the district court determined that the encounter between Steve Jr. and Page in the woods began as a valid investigatory stop, and that Page was entitled to draw and hold his weapon on Steve Jr. until he had a reasonable opportunity to ensure his safety. However, Page did not reholster his weapon after ordering Steve Jr. to come out of the trees, even though he ascertained no immediate danger that would justify his display of a weapon. According to the district court, "Deputy Page never took any action to [e]nsure his safety beyond his initial viewing of the defendant, which indicates that once the interrogation began he was not in any way still fearful for his safety." [8] The district court further found that Page's continued use and display of the gun transformed the investigatory stop into a custodial situation. We agree.

■ One well-recognized circumstance tending to show custody is the degree of physical restraint used by police officers to detain a citizen. *People v. Thiret,* 685 P.2d 193, 203 (Colo.1984); *Taylor,* 223 Cal.Rptr. at 644. Thus, "[i]f the police officer uses physical restraint on the suspect or draws a gun it is more likely to be deemed custodial than if the questioning occurs without physical restraint or opportunity to restrain." *People v. Herdan,* 42 Cal.App.3d 300, 116 Cal.Rptr. 641, 645 n. 11 (1974) (citations omitted); *cf. United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (display of a weapon by an officer is a factor to be considered in determining whether a reasonable person would have believed that he was free to leave).

Although testimony on this point was conflicting, the evidence in this case supports the district court's conclusion that Page had his gun drawn, either at his side or pointed at Steve Jr., throughout the encounter.[9] At the suppression hearing, Page admitted that he had his gun drawn while questioning Steve Jr., but was "unsure" whether he had the gun pointed directly at him. In contrast, Steve Jr.'s recollection of the event was far more vivid. According to Steve Jr., Page ordered him to come out of the trees at gunpoint, and began questioning him without

---

8. The record shows that Page did not conduct a pat-down search of Steve Jr., call for back-up assistance, or take any other protective measures.

9. Specifically, the district court found that "[t]hroughout this entire encounter the Deputy had his gun drawn and at times pointed at [Steve Jr.]."

reholstering the weapon. When asked why he told Page where the marihuana plants were located, Steve Jr. stated "I was scared ... I didn't think I had any choice. He was the one with the gun," and "I didn't want to get him too much more nervous because I didn't want to—you know, he had a gun in his hand."

Clearly, Page had no intention of letting Steve Jr. leave, and a reasonable person questioned by an officer at gunpoint would have concluded that he was not free to leave. *See, e.g., State v. Intogna*, 101 Ariz. 275, 419 P.2d 59, 65 (1966) (questioning a defendant with a drawn gun within three feet of him constitutes custody). Under these circumstances, we cannot say that the district court erred in finding that Steve Jr. was in police custody during the initial questioning by Page.

In holding that Page placed Steve Jr. in custody, we do not mean to suggest that *Miranda* warnings must be given in every instance where police initially use weapons or other force to effectuate an investigative stop. Rather, "the crucial consideration is the degree of coercive restraint to which a reasonable citizen believes he is subject *at the time of questioning*." *Taylor*, 223 Cal.Rptr. at 645 (emphasis in original). As the court pointed out in *Taylor*, "a contrary conclusion would imprudently endanger police officers by discouraging them from using protective measures reasonable in the circumstances to effect investigative stops." *Id.* However, police interrogation at gunpoint cannot occur without *Miranda* warnings.

Having found that Steve Jr. was in custody, we must next consider whether the statements which he made while in custody were the result of police interrogation. For purposes of *Miranda*, the term "interrogation" refers both to express questioning by a police officer, and to any words or actions on the part of the officer that he or she should know are reasonably likely to elicit an incriminating response from the defendant. *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980); *People in Interest of J.C.*, 844 P.2d 1185, 1189 (Colo.1993); *Probasco*, 795 P.2d at 1332; *Trujillo*, 784 P.2d at 790.

The prosecution argues that Page's statements did not amount to interrogation since Page could not predict that Steve Jr. would make statements that were tantamount to confessing to the crime of cultivation of marihuana. This argument misstates the test for determining whether an officer's conduct amounts to interrogation for purposes of *Miranda*. An officer's words can constitute interrogation, even if the officer did not intend to elicit an incriminating response from the defendant. This is because "[t]he determination of whether an officer's words or actions are 'reasonably likely to elicit an incriminating response' primarily depends 'upon the perceptions of the suspect, rather than the intent of the police.'" *Thomas*, 839 P.2d at 1178 (quoting *Innis*, 446 U.S. at 301, 100 S.Ct. at 1689–90); *People v. Lowe*, 200 Colo. 470, 474, 616 P.2d 118, 122 (1980).

In this case, the evidence supports the district court's conclusion that Steve Jr. was interrogated. Without reholstering his weapon, Page asked Steve Jr. who he was, what he was doing, and why he was hiding. Dissatisfied with Steve Jr.'s answers, Page accused Steve Jr. of lying and of destroying marihuana plants. At that point, Steve Jr. testified that he felt compelled to confess since "[Page] was the one with the gun." "There were questions all over. [Page] wasn't telling me anything. He was asking me."

The district court correctly found that Steve Jr. was subjected to a custodial interrogation undertaken by the police without advising Steve Jr. of his *Miranda* rights. Accordingly, it properly suppressed the statements made by Steve Jr. during this encounter.

## III

### *Marihuana Found on the Grounds of the Compound*

After Page's encounter with Steve Jr. in the woods, officers discovered marihuana throughout the grounds of the compound. Besides the four marihuana plants which Steve Jr. showed to Page, officers found marihuana in an irrigation ditch, in one of the

outbuildings north of Steve Jr.'s house, and in two bags under an old hay wagon. They also discovered marihuana drying in plain view in an old school bus parked on the property. The district court suppressed all of this evidence as a product of the illegal interrogation. In our view, the district court's analysis of this issue is erroneous, and requires partial reversal of the suppression order.

## A

■ Other than the four marihuana plants which Steve Jr. pointed out to Page during their encounter in the woods, the evidence does not show any connection between Steve Jr.'s statements and the marihuana found by officers without Steve Jr.'s assistance. Thus, the district court erred in treating this evidence as a fruit of the illegal custodial interrogation. In our opinion, this evidence is admissible as a product of a valid consent search.

■ The Fourth Amendment of the United States Constitution proscribes the warrantless search of a person's home or property.[10] *People v. Hopkins*, 870 P.2d 478, 480 (Colo.1994); *People v. McKinstrey*, 852 P.2d 467, 470 (Colo.1993). However, the prohibition against warrantless searches does not apply when voluntary consent has been obtained, either from the individual whose property is searched, or from a third party who possesses common authority over the property. *Illinois v. Rodriguez*, 497 U.S. 177, 181, 110 S.Ct. 2793, 2797–98, 111 L.Ed.2d 148 (1990); *United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974); *United States v. Falcon*, 766 F.2d 1469, 1474 (10th Cir.1985); *McKinstrey*, 852 P.2d at 470.

■ A third party does not have the authority to consent to a search simply by virtue of his ownership of the property. *Matlock*, 415 U.S. at 171 n. 7, 94 S.Ct. at 993 n. 7. *See also Chapman v. United States*, 365 U.S. 610, 616–17, 81 S.Ct. 776, 779–80, 5 L.Ed.2d 828 (1961) (a landlord generally does not have the authority to consent to a search of the tenant's premises). Rather, the authority which justifies the third-party consent rests on "mutual use of the property by persons generally having joint access or control for most purposes." *Matlock*, 415 U.S. at 171 n. 7, 94 S.Ct. at 993 n. 7. The prosecutor has the burden of proving common authority. *Rodriguez*, 497 U.S. at 181, 110 S.Ct. at 2797–98; *McKinstrey*, 852 P.2d at 471.

■ In ruling that David and Steve Sr. lacked common authority to permit the police to search the compound, the district court relied heavily on the fact that neither David nor Steve Sr. ever went into those areas where marihuana was planted. However, "the absence of *actual* use does preclude a finding of common authority." *United States v. Curcio*, 705 F.Supp. 237, 243 (E.D.Pa.1988). Rather, assumption of the risk is an important factor to consider in determining whether common authority to consent to a search exists. *Matlock*, 415 U.S. at 171 n. 7, 94 S.Ct. at 993 n. 7; *Curcio*, 705 F.Supp. at 243. When third persons have broad rights to access and use of one's property, one assumes the risk that they may consent to a search of those areas even if they never actually access or use the property. *See United States v. Cook*, 530 F.2d 145, 149 (7th Cir.) (common authority over property existed when owners maintained right to use the property, but did not actually use it), *cert. denied*, 426 U.S. 909, 96 S.Ct. 2234, 48 L.Ed.2d 835 (1976); *People v. Baughman*, 47 Ill.App.3d 209, 5 Ill.Dec. 621, 624, 361 N.E.2d 1149, 1152 (1977) (state could consent to search of barn; although state agents never entered the barn, they could have done so).

In this case, the evidence shows that David and Steve Sr.'s authority was not limited to areas of the compound where farm equipment and crops were stored. Rather, both David and Steve Sr. had an unrestricted right to come onto the grounds of the com-

---

10. Officers did have a warrant to search the Breidenbach Brothers' field where marihuana was spotted during the helicopter fly-over. However, this warrant did not encompass the com-

pound. As previously mentioned *supra* in part I, Breidenbach Brothers owned the field searched pursuant to the warrant, whereas Steve Sr. was the owner of the compound.

pound, and frequently exercised that right. At the suppression hearing, Steve Jr. testified that David and Steve Sr. regularly came onto the property whenever they wanted to, and could bring other persons onto the property. Although David and Steve Sr. may not have gone into the precise areas where marihuana was planted, Steve Jr. said that he would not stop them from doing so. In fact, he testified that they could go anywhere they wanted on the property, without restriction. By allowing David and Steve Sr. to have unlimited access to the grounds of the compound and to bring others onto the property whenever they chose to do so, Steve Jr. assumed the risk that they might permit police officers to search those areas where the marihuana was found. Thus, David and Steve Sr. had common authority to consent to a search of the grounds of the compound. *See Curcio,* 705 F.Supp. at 243 (realty company had common authority to consent to a search when defendant gave the company keys to the property and condoned the inspection of the area by potential lessees). We therefore reverse the district court's order suppressing the marihuana found on the grounds of the compound without Steve Jr.'s assistance.

### B

■ With respect to the four marihuana plants which Steve Jr. pointed out to Page, however, we agree that this evidence properly was suppressed.

■ Once a court determines that a statement was improperly obtained in violation of *Miranda,* any statements and real evidence subsequently acquired may be suppressible as the fruit of the illegal interrogation. *People v. Briggs,* 709 P.2d 911, 915–16 (Colo.1985); *People v. Lee,* 630 P.2d 583, 590 (Colo.1981), *cert. denied,* 454 U.S. 1162, 102 S.Ct. 1036, 71 L.Ed.2d 318 (1982); *People v. Saiz,* 620 P.2d 15, 20 (Colo.1980). However, not all evidence obtained as a result of an illegal interrogation must be suppressed under the exclusionary rule. Rather, the doctrine of inevitable discovery is recognized as an exception to the exclusionary rule that may allow admission of evidence even though it is derived from information obtained during an illegal custodial interrogation. *People v. Burola,* 848 P.2d 958, 961 (Colo.1993); *People v. Schoondermark,* 759 P.2d 715, 718 (Colo.1988).

■ Before evidence will be admitted under the inevitable discovery exception, the prosecutor must establish that the information ultimately or inevitably would have been discovered by lawful means. *Nix v. Williams,* 467 U.S. 431, 444, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377 (1984); *Burola,* 848 P.2d at 962; *Schoondermark,* 759 P.2d at 718; *Briggs,* 709 P.2d at 922. In our opinion, the prosecutor failed to meet its burden of showing that the four plants inevitably would have been discovered absent Page's illegal custodial interrogation of Steve Jr.

■ Evidence is not admissible under the inevitable discovery exception based on nothing more than a judge's hunch or speculation that the evidence would have been discovered anyway. *Burola,* 848 P.2d at 963; 4 Wayne R. LaFave, *Search and Seizure,* § 11.4(a), at 383 (2d ed. 1987). Rather, the prosecutor must establish that there was a reasonable probability that the evidence would have been discovered in the absence of police misconduct, and that the police were pursuing an independent investigation at the time the illegality occurred. *United States v. Cherry,* 759 F.2d 1196, 1205–06 (5th Cir. 1985), *cert. denied,* 479 U.S. 1056, 107 S.Ct. 932, 93 L.Ed.2d 983 (1987) (cited with approval in *Burola,* 848 P.2d at 962 n. 4).

In the present case, the prosecutor presented *no* evidence of independent investigatory measures by which the four plants inevitably would have been discovered. Although officers had authority to search the areas of the compound where the four plants were found, there was absolutely no testimony concerning whether the officers *would* have searched those areas without the information gained from Steve Jr. during the illegal custodial interrogation. For example, we are given no description of the search undertaken or the likelihood that the plants would have been discovered in the course of the planned search. *Compare Nix,* 467 U.S. at 448–49, 104 S.Ct. at 2511–12 (evidence supported view that body inevitably would have

been discovered; officers testified that they marked highway maps off in a grid fashion, and assigned teams to search each specific grid area). In other words, the prosecution failed to carry its burden of proof and has left us to speculate that these plants would have been discovered anyway. We therefore affirm the district court's suppression order with regard to these four plants.

## IV

### Consent to Search of Home

■ We next address the district court's order suppressing the evidence seized in Steve Jr.'s home during a search conducted pursuant to Steve Jr.'s consent. As the district court recognized, the admissibility of this evidence turns on the validity of Steve Jr.'s consent.

■ When consent is given after an interrogation in violation of *Miranda,* the consent is likely to be tainted by the unconstitutional interrogation. *People v. Cleburn,* 782 P.2d 784, 787 (Colo.1989), *cert. denied,* 495 U.S. 923, 110 S.Ct. 1959, 109 L.Ed.2d 321 (1990). However, one way that the allegedly illegal taint may be purged is by demonstrating the voluntariness of the consent. *United States v. Maez,* 872 F.2d 1444, 1453 (10th Cir.1989). If the consent is not sufficiently an act of free will so as to purge the taint of the illegal interrogation, it must be suppressed as the fruit of the poisonous tree. *Id.*

■ Whether a consent to search is sufficiently an act of free will to purge the taint of an illegal custodial interrogation depends upon the totality of the circumstances surrounding the consent. *Id.* at 1454. In making this determination, the district court should consider factors such as the defendant's age, education, intelligence and state of mind, as well as the duration, location, and other circumstances of the search. *Cleburn,* 782 P.2d at 787; *People v. Carlson,* 677 P.2d 310, 318 (Colo.1984). These circumstances include the temporal proximity between the interrogation and the consent, the presence of intervening circumstances, and the pur-

pose and flagrancy of the official misconduct. *United States v. Lowe,* 999 F.2d 448, 451 n. 6 (10th Cir.1993); *Maez,* 872 F.2d at 1454.

■ We recognize that Steve Jr. has a twelfth-grade education and was thirty-nine years old at the time of the search. Thus, he was plainly capable of giving effective consent. Nevertheless, the record as a whole supports the district court's conclusion that Steve Jr.'s consent to the search of his home was the involuntary product of the illegal custodial interrogation. First, only twenty-four minutes had lapsed between the time of Steve Jr.'s arrest and his signing of the consent form. Although not determinative, temporal proximity is a relevant factor to consider in determining whether a consent to search is an involuntary product of the initial constitutional violation. *See Perdue,* 8 F.3d at 1468 n. 8; *Maez,* 872 F.2d at 1454; *Saiz,* 620 P.2d at 20.

■ Second, there were no meaningful intervening factors to break the causal connection between the consent to search and the custodial interrogation. Steve Jr. was permitted to speak with his father for approximately three to five minutes before he signed the consent to search form. However, this conversation took place in the presence of the officers, and did not concern police requests to search Steve Jr.'s home for marihuana.[11] In addition, Steve Jr. was handcuffed and in Page's custody throughout this time period. The fact that the defendant was in custody, standing alone, is not sufficient to render his consent involuntary. *United States v. Watson,* 423 U.S. 411, 424, 96 S.Ct. 820, 828, 46 L.Ed.2d 598 (1976); *People v. Helm,* 633 P.2d 1071, 1077 (Colo. 1981); *Lowe,* 200 Colo. at 478, 616 P.2d at 124. However, it is a factor which a court may consider when evaluating the totality of the circumstances. *United States v. Iribe,* 806 F.Supp. 917, 920 (D.Colo.1992), *aff'd in part and rev'd in part,* 11 F.3d 1553 (10th Cir.1993); *People v. Traubert,* 199 Colo. 322, 329, 608 P.2d 342, 347 (1980).

11. Rather, both Bollish and Steve Jr. testified that this conversation pertained to an "eagle" which Steve Sr. feared officers would find on the property.

Third, Steve Jr. agreed to sign the consent form after being told by Bollish that "[w]e are going to get a warrant anyway." A defendant's consent is not rendered involuntary simply because officers warn him that a warrant will be sought if he refuses to consent. *People v. Hancock*, 186 Colo. 30, 33, 525 P.2d 435, 437 (1974); 3 Wayne R. LaFave, *Search and Seizure*, § 8.2(c), at 185 (2d ed. 1987). However, in this case Steve Jr. already had made incriminating statements to Page while in the woods, and had provided Page with information which Steve Jr. believed could form the basis for a search warrant. Therefore, Steve Jr. felt that he had nothing to lose by consenting to a search of his home. *See Cleburn*, 782 P.2d at 787. As he explained at the suppression hearing, "I figured I already showed them the plants up there. I figured, you know, what would stop them from [getting a warrant]." These circumstances support the district court's conclusion that Steve Jr.'s consent to a search of his home and all evidence found in the home were obtained as a result of the illegal custodial interrogation. Therefore, we affirm that portion of the order suppressing all evidence seized at Steve Jr.'s home.[12]

## V

### Written Confession

Finally, the prosecution contends that the district court erred in suppressing Steve Jr.'s written confession, obtained at the jail after *Miranda* warnings were given. We disagree.

Statements made by a defendant before the police administer a *Miranda* warning do not automatically render inadmissible subsequent statements which are both voluntary and obtained after a valid *Miranda* advisement. *People v. Mendoza–Rodriguez*, 790 P.2d 810, 814 (Colo.1990). Rather, a court must first determine whether the defendant's pre-*Miranda* statements were voluntary. *Id.* If they were, then the defendant's post-*Miranda* statements are admissible so long as they were voluntary. *Oregon v. Elstad*, 470 U.S. 298, 318, 105 S.Ct. 1285, 1297–98, 84 L.Ed.2d 222 (1985); *Hamilton*, 831 P.2d at 1332. However, if the pre-*Miranda* statements were not made voluntarily, the defendant's post-*Miranda* statements will be admitted only if they were not tainted by the prior involuntary statements. *Mendoza–Rodriguez*, 790 P.2d at 814–15.

A statement is involuntary if coercive police activity played a significant role in inducing the statement. *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 521–22, 93 L.Ed.2d 473 (1986); *People v. Hutton*, 831 P.2d 486, 488 (Colo.1992); *People v. Gennings*, 808 P.2d 839, 843 (Colo.1991); *People v. Branch*, 805 P.2d 1075, 1080 (Colo.1991). In order to make this determination, a court must consider the totality of the circumstances surrounding the making of the statement. *Thomas*, 839 P.2d at 1180; *Hutton*, 831 P.2d at 488. Factors which a court should consider include:

> whether the defendant was in custody or was free to leave and was aware of his situation; whether *Miranda* warnings were given prior to any interrogation and whether the defendant understood and waived his *Miranda* rights; whether the defendant had the opportunity to confer with counsel or anyone else prior to the interrogation; whether the challenged statement was made during the course of an interrogation or instead was volunteered; whether any overt or implied threat or promise was directed to the defendant; the method and style employed by the interrogator in questioning the defendant and the length and place of the interrogation; and the defendant's mental and physical condition immediately prior to and during the interrogation, as well as his educational background, employment status, and prior experience with law enforcement and the criminal justice system.

*Gennings*, 808 P.2d at 844. A district court's findings of fact concerning voluntariness are entitled to deference on appeal. *Hutton*, 831 P.2d at 488; *Jones v. People*, 711 P.2d 1270, 1278 (Colo.1986).

---

12. The district court found that Denise Breidenbach did not consent to a search of the home, and the prosecution does not dispute this finding.

Accordingly, all of the evidence found in the home must be suppressed as to both defendants.

The prosecution argues that the suppression order must be reversed because the district court did not determine whether Steve Jr.'s pre-*Miranda* statements were voluntary. We disagree. While the district court did not explicitly determine that each of Steve Jr.'s pre-*Miranda* statements was involuntary, that conclusion is the clear implication of the court's order. For example, the court found that Steve Jr.'s actions and statements in showing Page the location of the four marihuana plants were "the result of undue influence and were not the products of a free and unconstrained choice." Moreover, the court frequently characterized the police action in this case as "extensive and coercive" misconduct.

The prosecution also argues that Steve Jr.'s pre-*Miranda* statements were voluntary because there is no evidence that Steve Jr. was coerced into showing Page the location of the four marihuana plants.[13] However, as the district court found, Page essentially conducted a "forced search" for the marihuana when he held Steve Jr. by the arm with his gun drawn, and instructed Steve Jr. to point out the location of the plants. Based on this evidence, we agree with the district court that Steve Jr.'s pre-*Miranda* statements and actions were involuntary.

Once the district court determined that Steve Jr.'s pre-*Miranda* statements were involuntary, the remaining issue is whether Steve Jr.'s post-*Miranda* written confession was tainted by his prior involuntary statements. One way in which the prosecutor can purge the illegal taint of a prior involuntary statement is by demonstrating the voluntariness of the subsequent confession. *Thomas*, 839 P.2d at 1180. In assessing the voluntariness of the subsequent confession, the court again must consider the totality of the circumstances surrounding the confession. *Id.; Hutton*, 831 P.2d at 488. Factors such as "the time that passes between confessions, the change in place of interrogations and the change in identity of the interrogators all bear on whether the coercion has carried over into the second confession." *Elstad*, 470 U.S. at 310; *Mendoza-Rodriguez*, 790 P.2d at 815.

In the present case, the evidence shows that Steve Jr.'s written confession was made approximately one hour and five minutes after his arrest. In addition, the district court found evidence of police misconduct at the jail, where officers continued to rely on the prior illegally obtained information in extracting the written confession. According to the district court, the officers made statements to Steve Jr. to the effect that "you might as well confess, since you have already shown the plants and given consent to search," and "it will be better for you to give a statement." As Page explained, "[b]asically, it was my pull to get [Steve Jr.] to admit what he was doing."

Nor were there any significant intervening factors to dissipate the taint of the prior involuntary statements. As the district court noted, other officers were present at the jail, but Page was still integrally involved in obtaining the confession.[14] *See Perdue*, 8 F.3d at 1468 (switch of interrogating officers did not break chain of events when one officer continued to be a constant and immediate presence); *United States v. Patino*, 830 F.2d 1413, 1418 (7th Cir.1987) (taint not purged when defendant was continually in the company of one officer), *cert. denied*, 490 U.S. 1069, 109 S.Ct. 2072, 104 L.Ed.2d 637 (1989). Steve Jr. was given a *Miranda* advisement prior to making the statement. However, "*Miranda* warnings per se do not break the causal connection between the illegality and the evidence obtained subsequent to the ille-

---

**13.** The prosecution further contends that Steve Jr.'s initial statements to Page were voluntary since they were made during the course of an investigatory stop. As we explained *supra* in part II, defining an encounter as an "investigatory stop" does not immunize police conduct from constitutional challenge. Involuntary statements are inadmissible, even if they were elicited during a valid investigatory stop. *Perdue*, 8 F.3d at 1466–67.

**14.** In addition, Steve Jr. was able to speak with his father prior to signing the consent to search form. However, this conversation was not sufficient to break the causal connection between Steve Jr.'s prior involuntary statements and his written confession. As discussed *supra* in part IV, the conversation between Steve Jr. and Steve Sr. was not fully private, and did not concern the matters under investigation.

gality." *Thomas*, 839 P.2d at 1181; *People v. Jones*, 828 P.2d 797, 800 (Colo.), *cert. denied*, —— U.S. ——, 113 S.Ct. 305, 121 L.Ed.2d 228 (1992). *See also Brown v. Illinois*, 422 U.S. 590, 603, 95 S.Ct. 2254, 2261–62, 45 L.Ed.2d 416 (1975). This is especially true when the defendant has already incriminated himself before the warnings were given. *See Perdue*, 8 F.3d at 1468; *United States v. Matthews*, 488 F.Supp. 374, 379 n. 2 (D.Neb.1980).

In assessing the totality of the circumstances, we agree that the written confession was a fruit of the illegal custodial interrogation. As such, it was correctly suppressed by the district court.

### VI

In summary, we hold that the district court erred in suppressing evidence of all marihuana found on the grounds of the compound, except for the four plants which Steve Jr. pointed out to Page. In our opinion, this evidence is admissible as a product of a valid consent search; it is not a fruit of the illegal custodial interrogation. However, the four plants, as well as Steve Jr.'s statements and actions in the woods, his written consent to the search of his home and all evidence found in the home, and his written confession, were all properly suppressed by the district court. Therefore, the district court's ruling is affirmed in part, reversed in part, and the case is remanded for further proceedings consistent with this opinion.